[Civil No. 3369.   Filed June 1, 1934.]

[33 Pac. (2d) 604.]

MUTUAL BENEFIT HEALTH AND ACCIDENT
ASSOCIATION, a Corporation, Appellant, v.
HAROLD NEALE, Appellee.

534

Mr. G. W. Shute and Mr. Charles Bernstein, for Appellant.

Messrs. Ellinwood & Ross, Mr. Norman S. Hull and Mr. Joseph S. Jenckes, Jr., for Appellee.

LOCKWOOD, J.—This is an appeal by Mutual Benefit Health and Accident Association, a corporation, hereinafter called defendant, from a judgment in favor of Harold Neale, hereinafter called plaintiff, on an accident and health insurance policy issued by defendant to plaintiff. Construing the evidence in the manner most favorable to plaintiff's contention, as under the verdict of the jury we must, the record shows the material facts to be as follows:

On September 11, 1930, defendant issued to plaintiff a policy of accident and health insurance, which reads in part as follows:

"Mutual Benefit Health and Accident Association, Omaha. (Herein called Association)

"Insuring Clause:

"Does Hereby Insure Harold Neale (herein called the Insured) of City of Phoenix, State of Arizona against loss of life, limb, sight or time, resulting

directly and independently of all other causes, from bodily injuries sustained thru purely Accidental Means (Suicide, sane or insane, is not covered), and against loss of time on account of disease contracted during the term of this Policy, respectively, subject, however, to all the provisions and limitations hereinafter contained. . . .

"Waiver of Premium.

"When claim for permanent total disability of the Insured, due to bodily injuries or sickness covered by this policy, has been filed and approved while this policy is in force, there will be no further premium payable, but the Insured will draw benefits as provided in the policy.

"[Seal.]

"Series 302.

"Part D.—Total Accident Disability One Hundred Dollars Per Month for Life.

"If such injuries as described in the Insuring Clause, do not result in any of the above mentioned specific losses but shall wholly and continuously disable the Insured for one day or more, and so long as the Insured lives and suffers said total loss of time, the Association will pay a monthly indemnity at the rate of One Hundred ($100.00) Dollars. . . .

"Part K.—Additional Benefits If Confined to Hospital.

"If the Insured on account of any accidental injury or disease covered by this policy shall enter a hospital and be necessarily and continuously confined therein solely on account of said injury or disease, the Association will reimburse him for his actual hospital expense, but not exceeding One Hundred Dollars ($100.00) per month or a proportionate amount for any fractional part of a month. This benefit is in addition to any other monthly benefits and shall be payable for a period not exceeding three months."

At this time plaintiff was a meat cutter working at the Linsenmeyer Post Office Market in the city of Phoenix. On October 15, 1930, he was engaged in

the lifting of a 206-pound quarter of beef, when it fell from a wall scale and struck him across the back and left shoulder. His first impression of injury was a numbness in his back, and he went to his home shortly thereafter, but was unable to eat or sleep. He returned to the market the following day, but finding that he was wholly unable to perform his duties he consulted a physician, who immediately sent him to the hospital, where he remained until November 24th. On November 14th, and while in the hospital, he made formal application to defendant for disability payments under his policy, and about the same time made claim to the Arizona Industrial Commission for compensation under the Workmen's Compensation Law (Rev. Code 1928, § 1391 et seq.). Defendant failed to act on the claim for some time, but, after being requested by the Industrial Commission to decide the matter, on December 26th began paying disability benefits under clauses D and K of the policy. The Industrial Commission made payments to plaintiff until the middle of February, 1931, when they were temporarily discontinued, but resumed later. After plaintiff's release from the hospital on November 24th he did not improve, and was placed in a plaster cast. In the month of January, 1931, Dr. R. B. Rainey was called in by Dr. Charles W. Sult, plaintiff's first physician, for consultation, and on March 27, 1931, he was retained as his regular physician by plaintiff. At that time the latter had lost nearly 100 pounds in weight and suffered a partial paralysis of the bladder, rectum and lower extremities. He was immediately returned to the hospital, where he remained from March 28th until October, 1931. During this time he remained almost completely paralyzed, and was so weak that part of the time he was unable to even hold a drinking tube without assistance, and lost in weight until he was reduced from a normal of 190 pounds to a little over

70. He was irrational and troubled with hallucinations and had to be forcibly fed and administered opiates, and received no less than seven blood transfusions. Dr. Rainey called Dr. A. M. Tuthill in consultation, and their final diagnosis was serous meningitis, occasioned by an injury or irritation of the spinal cord. In the opinion of Dr. Rainey the condition was due solely to the injury received by plaintiff in the accident above described, and no other medical expert assigned any other cause therefor. To remove the pressure from plaintiff's spinal cord, Dr. Rainey performed three spinal operations; the first on April 7th, the second April 15th, and the third May 29th. After the last operation plaintiff began to improve, and at the time of trial was able to get around on crutches, his weight had increased to 150 pounds, and he was almost free from pain, while the paralysis had to a great extent disappeared. The operation necessitated the removal of several inches of the bone of the spinal column, and his spinal cord for that distance is now covered only by skin and muscle, and in the opinion of the medical witnesses he will never be able to do any heavy physical labor, although in two or three years he might be able to do light office work, while his bowels and bladder will never fully recover their normal functions.

Immediately after his discharge from the hospital he went with his wife and nurse to California so that he might visit his sister, Mrs. May Wagner, and there recuperate. Defendant failing, after demand, to make further payments on the policy, he filed suit on April 27, 1932, to recover under clause D thereof in the amount of $100 per month for the time his injury had lasted, this time being by supplemental complaint on December 19, 1932, extended to and including the month of November of that year.

Defendant's first amended answer on which the case was tried admitted the issuance of the insurance policy, but denied all the other material allegations of the complaint, and alleged that about the 1st of April, 1931, defendant discovered that plaintiff's injury was not caused by the accident above set forth, but by a spinal tumor existing long prior to the taking of the insurance policy, and further that on the 27th day of May, 1930, the defendant offered the sum of $900 as a compromise and settlement in full of any liability under said policy, which was accepted and retained by plaintiff.

Plaintiff replied, denying the execution of any settlement or release of the policy by him, or the receipt of any money therefor, and claimed that at the time of the alleged settlement he was ill and mentally incapable of transacting any business whatever, and that if a release was executed in his name at that time he had no knowledge or recollection of ever having signed the same or received any money whatever, and that if his signature was affixed to a release, it was fraudulently procured by defendant, who had full knowledge of his condition. He also maintained if the $900 claimed to have been paid by defendant in settlement of the policy was paid to anyone, it was not done with plaintiff's knowledge, approval or consent, and offered if said sum was paid to anyone and expended in his behalf, to credit such amount on any judgment which he might receive. The case was tried to a jury, which returned a verdict in favor of plaintiff in the sum of $1,400.

There are six assignments of error which we will consider in such manner as seems advisable, in accordance with the legal proposition raised thereby. The first question is whether the evidence justified the jury in finding that there was no valid release of policy made by plaintiff. In order to determine this we will have to review at some length the testi-

mony in regard to the alleged release of May 27th. Defendant offered in evidence a formal release of the policy, complete in form, appearing to have been signed by Harold Neale and witnessed by E. B. Brink, who was at the time defendant's local agent in Phoenix, and a check for $900 payable to plaintiff, which stated on its face it was in full settlement of all claims under the policy. This check had indorsed upon its back the names of Harold Neale, John G. Neale and E. G. Brink, and was cashed by John G. Neale. On their faces, these documents were a complete defense to the action. Plaintiff claimed, however, that they were not executed with his knowledge and consent, and offered testimony to the following effect: On the 27th day of May, he was flat on his back in bed, with his spine draining, and so weak and emaciated that he was unable to hold his own drinking tube. He had recently been given a blood transfusion and had been taking opiates of several descriptions to relieve his pain. In the opinion of his attending physician, he was at his lowest ebb about that time, and was utterly incapable of transacting business of any kind, so much so that all visitors, except his relatives, had been refused permission to see him, and Brink especially had been denied that privilege. Notwithstanding these facts, Brink, Mrs. May Wagner, who was plaintiff's older sister and a graduate nurse, and his brother, John G. Neale, went to see plaintiff at the hospital. At this time both defendant and the Industrial Commission had discontinued the payments they had been making plaintiff, and, as he had no other income, he and his wife were entirely destitute, many of his bills were unpaid, a mortgage on their home about to be foreclosed, and approximately ten days previously a child had been born to Mrs. Neale. Due to plaintiff's extremely weak physical and mental condition, his wife, brother and sister had not told him of these

financial difficulties, but Mr. Brink had been informed of them. On the 26th and 27th of May, John Neale and Mrs. Wagner had several conferences with Brink endeavoring to persuade him to continue the monthly payments, which he refused to do, but suggested that there be a compromise of the claim, and after considerable discussion John Neale agreed to accept $900 in full settlement. There is no evidence that plaintiff ever acquiesced in or even suggested this settlement, but, on the contrary, it appears that he had previously repeatedly refused to agree to anything except full payment according to the terms of the policy.

When the three went to plaintiff's room they found him flat on his back in bed, so they seated themselves around the bedside. The testimony is in sharp and direct conflict as to what occurred in the room. According to Brink, plaintiff was fully conscious and understood perfectly the general nature of the proposed settlement, and assented thereto, raised himself in bed, and, holding a pen in one hand and a magazine with the release and check lying on it in the other, indorsed his name on the two latter, and requested his brother to cash the draft. Mrs. Wagner and John Neale, on the other hand, testified that plaintiff was not rational and when she said something to him about signing a paper he made no reply, and that she then asked if she could hold plaintiff's hand so that he could make a cross on the instrument, but Brink told her it would be better to use plaintiff's hand to make the entire signature. Thereupon they handed a pen to John Neale and held the magazine with the check and release on it in front of plaintiff, while John Neale lifted his hand and guided it across the check and release, writing the name Harold Neale. Thereafter the check was indorsed by John Neale and Brink, and the two went to the bank, where it was cashed. Plaintiff himself testified

that he had no recollection whatever of the transaction of May 27th.

Were this all the testimony on this point there can be no question that it was sufficient to authorize the jury to find that the release in question was secured without the knowledge or consent of plaintiff. Defendant, however, introduced two handwriting experts who testified that in their opinion the name of Harold Neale on the release and check, when compared with other signatures admittedly made by him, showed conclusively that they were not made in the manner described by Mrs. Wagner and John Neale, but by plaintiff himself, and it is urged upon us that this testimony, together with that of Brink, makes the testimony of Mrs. Wagner and John Neale so incredible that it falls within the rule laid down by this court in *Inter-State Fidelity Building & Loan Association* v. *Hollis,* 41 Ariz. 295, 17 Pac. (2d) 1101. In that case the vital question was whether or not certain words appearing on the face of a printed note had been printed therein after the body of the note was printed. We held the physical appearance of the note under the microscope was such that it was incredible that such a thing could have happened, and therefore held the verdict of the jury must have been actuated by passion and prejudice.

The situation is very different in the present case. The ordinary layman knows, without the testimony of an expert, that a man lying on his back may have his hand held by another so that a pen therein will trace his signature on a document, and, in fact, one of the expert witnesses admitted such a thing would be possible. But, it is urged, these witnesses testified that the signatures were so characteristically those of plaintiff that he must have exercised his own volition in guiding his pen.

Even admitting that the muscular movements which framed the signature "Harold Neale" were

made by himself, and that John Neale merely steadied his hand, this does not necessarily imply that Harold Neale was conscious of what he was doing. It is notorious that when persons are ill they frequently exercise many automatic reflexes to which they have been used, without any mental consciousness of the nature of their acts, and it is entirely possible that with the familiar feeling of a pen in his hand, especially in view of the fact that Mrs. Wagner had previously asked him to sign his name, he may have had enough strength and consciousness to go through the muscular movements necessary to trace his name when his hand was steadied by his brother, so that his signature would reflect its usual characteristics without his having any consciousness of the fact that he was signing either a check or a release. We are of the opinion that on the whole record there was ample evidence to justify the jury in believing that plaintiff, at the time he signed the release and check referred to, was not conscious of the nature of his acts and had at no time authorized such release to be made by any other person.

The next question is whether he ratified the actions of his brother and sister on May 27th. Defendant contends that when a principal accepts the benefits of a contract made by his agent it is an implied ratification. As a general proposition this is true, of course; but it must appear that the principal has knowledge of all the facts surrounding the contract made by the agent, and that, with full knowledge thereof, he accepts the benefits of the contract. The evidence in this case is that plaintiff had no knowledge of the execution of the release in question until some time in November or December of 1931, and that he immediately and at all times thereafter disavowed it. It is true that the $900 in question was paid to John Neale, his brother, and by him presumably used for plaintiff's benefit, but there is no evidence in the

record that plaintiff knew of the receipt and use of such money, until after it was entirely expended. Under such circumstances the fact that the money was expended for plaintiff's benefit was not a ratification of the unauthorized acts of his agent, nor was he obliged under all the circumstances, as shown by the evidence, to tender the $900 to defendant as a condition precedent to the bringing of· this action. *Atchison etc. Ry. Co.* v. *Peterson,* 34 Ariz. 292, 271 Pac. 406.

The remaining questions deal with the admission and rejection of evidence and the refusal to give certain instructions. We consider first the instructions. There were five requested by defendant, four of which were refused by the court, and the fifth given in a modified form. Instruction No. 1 submits to the jury the question of whether the disability claimed by plaintiff was the result of the operations performed by Dr. Rainey in 1931. The pleadings and evidence of defendant do not support the instruction. The defense pleaded was that the injury was the result of a tumor existing long before the issuance of the policy, while the instruction is based on the theory that the injury was caused by an operation, and there is no evidence to this effect.

Instruction No. 2 is a lengthy one, covering the alleged release of May 27th. It is objectionable as assuming certain facts in dispute, and also as stating incorrectly the law in several particulars.

Instruction No. 3 is to the effect that if the premium on the policy was not paid, it expired as a matter of law. This overlooks the fact that the policy itself provides that when proof of disability has been made and allowed, the premiums are suspended during the term of such disability. The undisputed evidence shows that defendant did receive the claim, and for several months made payments under the policy. This, we think, satisfies the condi-

tion in regard to the waiver of premium pending a final determination of the duration of disability.

Instruction No. 4 covers the question of whether plaintiff's injury was accidental within the terms of the policy, and since defendant admits this issue was properly submitted to the jury by other instructions, it was not error to refuse the requested instruction.

Instruction No. 5 was given in part and refused in part. That part which was refused was to the effect that before plaintiff could maintain this action he must return to the defendant the $900 paid to John Neale. This, as we have stated, is not the law under the circumstances of the present case. We find no error in the actions of the trial court in regard to the instructions.

There are three assignments of error in regard to the admission or rejection of evidence. The first is that the court refused to admit two telegrams between Brink and defendant discussing the details of a proposed settlement in March. One of the telegrams was signed by Brink and the other presumably by a representative of defendant at the home office. These telegrams were obviously self-serving in character, and were properly rejected. *McCormick* v. *Travelers' Ins. Co.*, 215 Mo. App. 258, 264 S. W. 916; *Helbig* v. *Citizens' Ins. Co.*, 234 Ill. 251, 84 N. E. 897.

A letter from John Neale to the plaintiff, dated March 3, 1932, which contained a statement by the former as to just what occurred regarding the settlement of May 27th, was offered on the issue of ratification. It was plaintiff's contention that while he knew in November or December, 1931, some kind of a settlement had been made, it was not until he received this letter from his brother that he knew the details of what happened on May 27th, and was in a position to act intelligently on the matter. We think it was admissible for this purpose. Further, the letter merely detailed what was testified to fully by

John Neale and Mrs. Wagner, so that even if its admission was erroneous, it was harmless.

This brings us to the last and, in our opinion, the most serious question in the case. Plaintiff offered in evidence certain findings and an award of the Industrial Commission for the avowed purpose of making a *prima facie* showing thereby that plaintiff's injury was caused by an accident. The material finding upon which the award was based is in the following language:

"1. That the above-named applicant, while employed in the State of Arizona by the above-named defendant employer, who was insured against liability for compensation under the law by the above-named defendant insurance carrier, sustained an injury by accident arising out of and in the course of his said employment on October 15th 1930, which injury caused disability entitling said applicant to compensation therefor in the total sum of $2723.71, all of which has been paid."

It is the contention of plaintiff that these were admissible under sections 1393 and 4454, Revised Code of 1928, which read, so far as material, as follows:

"§ 1393. . . . And copies of orders or records of the commission certified by the secretary of the commission under its seal, shall be admissible in evidence.

"§ 4454. Records of public officials; of notaries. The records required to be made and kept by a public officer of the state, county, municipality or of any body politic, and copies thereof certified under the hand and seal (if there be one) of the legal custodians of such records, and the declarations and protests made and acknowledgments taken by notaries public, and certified copies of their records and official papers, shall be received in evidence by the courts of the state as *prima facie* evidence of the facts therein stated. (§§ 2543, R. S. '01; 1739–40, R. S. '13, cons. & rev.)"

It is the contention of plaintiff that section 4454, *supra,* makes all records of all public officers admissible in evidence, whenever anything which is stated therein as a fact may be material in any case pending in any court, and such record is *prima facie* evidence of the truth of the fact therein stated, regardless of the nature of the public record, or whether under the general rules of evidence it would have been excluded. It is the position of defendant, on the other hand, that the findings and award of the Industrial Commission are similar in their effect to the judgment of a court of record, and, as evidence, subject to the same limitations as such a judgment would be, and are therefore not admissible for the purpose for which they were offered by plaintiff.

While the Industrial Commission of Arizona is not, technically speaking, a court, we have held repeatedly that it acts in a judicial capacity, and while it is not subject to all of the technical rules of court procedure, yet when it sits for the purpose of making awards, it must observe the fundamental principles of justice as distinct from the technical rules by which such principles are applied. *Doby* v. *Miami Trust Co.,* 39 Ariz. 228, 5 Pac. (2d) 187. Such being the case, we think the findings and awards of the Commission are subject to the same limitations as to their use as evidence as are the findings and judgments of a trial court.

As a matter of common law, it has long been the rule that a judgment *in personam,* as against any person who is a stranger to the cause, is evidence only of the fact of its own rendition, and may not be introduced to establish the facts upon which it has been rendered. *Dorsey* v. *Gassaway,* 2 Har. & J. (Md.) 402, 3 Am. Dec. 557; *Beeckman* v. *Montgomery,* 14 N. J. Eq. 106, 80 Am. Dec. 229. And the test of whether a person is a stranger is whether he was interested in the subject matter of the proceeding, with

the right to make defense, to adduce testimony, to cross-examine the witness on the opposite side, to control in some degree the proceeding, and to appeal from the judgment. *Fitzhugh* v. *Croghan*, 2 J. J. Marsh. (Ky.) 429, 19 Am. Dec. 139; *Smith* v. *White*, 63 W. Va. 472, 60 S. E. 404, 14 L. R. A. (N. S.) 530; *Carroll* v. *Carroll*, 60 N. Y. 121, 19 Am. Rep. 144; *Lowell* v. *Parker*, 10 Met. (Mass.) 309, 43 Am. Dec. 436.

As was said in the case of *Tierney* v. *Phoenix Ins. Co.*, 4 N. D. 565, 62 N. W. 642, 643, 36 L. R. A. 760:

" . . . Beyond the small circle which contains parties and privies, a judgment *in personam* is evidence only of the fact that such a judgment has been rendered. It cannot be used to prove any other fact which it establishes as between the parties to the judgment. 2 Black, Judgm. § 600. No further citation is necessary in support of a doctrine so elementary. The rule is salutary. Nay, it is indispensable to the administration of justice. The contrary doctrine would be subversive of the fundamental principle, recognized by all civilized nations, that every one is entitled to a hearing before being affected in his person or property by the judgment of a court. As a general rule, a stranger to a litigation has no knowledge of its pendency. If by chance he learns of it, he is yet powerless to appear in it. He has no right to offer evidence or cross-examine witnesses. He cannot be heard in argument on either the law or the facts. He cannot move for a new trial. He has no right to appeal. He is utterly without voice in the proceedings.

"We are unable to find any decision to support the contention of the plaintiffs, nor can we discover any reason why this case should be taken out of this elementary and wise rule. . . . "

For many years certain other public records, not judgments of courts, have been received in evidence as *prima facie* proof of the facts therein contained. The reason for this rule has been well stated by Dean

Wigmore in his great work on evidence as being the expediency of accepting the hearsay testimony of an official in certain classes of cases, because of the great interruption of public business which would be caused by calling such officer to testify in person. The justification for allowing this exception in the case of public records, is the presumption that public officers do their duty. When it is a part of the duty of a public officer to make a statement as to a fact coming within his official cognizance, the great probability is that he does his duty and makes a correct statement. This fact is taken as a sufficient guarantee of trustworthiness to make up for the lack of cross-examination allowed when the witness is present in person.

But this rule, under the common law, has been only applied to administrative records, such as registers of birth, marriages or death, official log-books, tax rolls and similar records, where it is the duty of the public officer to record a fact within his personal knowledge or that of his deputies. It has never, so far as we know, been applied to judgments.

At first it was necessary to produce the original record made by the officer, and this became, as business and litigation increased, greatly inconvenient and indeed hazardous to the safety of the records themselves. For this reason many, if not most, states have endeavored to deal with the matter by statute, and so far back as 1887, our legislature adopted paragraphs 1869 and 1871 of the Revised Civil Code of that year, which read as follows:

"1869. (Sec. 45.) Copies of the records of all public officers and courts of this territory, certified to under the hand and seal (if there be one) of the lawful possessor of such records, shall be admitted as evidence in all cases where the records themselves would be admissible.

"1871. (Sec. 47.) All declarations and protests made and acknowledgments taken by notaries public,

and certified copies of their records and official papers, shall be received as evidence of the facts therein stated, in all courts of this territory.''

These two separate sections were carried on substantially unchanged in the Civil Codes of 1901, paragraphs 2541, 2543, and 1913, paragraphs 1738–1740. Upon examining them it will be found that they refer to two distinct classes of records. Paragraph 1871 covers the records of notaries public, and certified copies of their records, as well as declarations, protests, and acknowledgments given by them, are not merely admitted in evidence, but are evidence of the facts stated therein, not conclusively, of course, but at least sufficient to make a *prima facie* case. On the other hand, the copies of all other records are only admissible when the records themselves would be admissible, and nothing is said as to their effect. In other words, the effect of paragraph 1869 was merely to give a copy of the record the same effect as the original, leaving the general question of the admissibility and effect of the record to the general rules of evidence sanctioned by the common law.

In 1928, the legislature revised and recodified the laws. In so doing one of their avowed purposes was to reduce the bulk of the statutory law and to avoid redundancy and repetition therein, and in pursuance of this purpose many sections were reworded, some were consolidated with others, and a few omitted. The sections above quoted, which in the Civil Code of 1913 were paragraphs numbered 1738–1740, were consolidated and revised, and appear in the 1928 Code as section 4454, *supra*. We have held previously that unless the context of the new Code is such as to make such an interpretation unreasonable, we will presume that the legal effect of the consolidation and restatement of the law is the same as that of the old statutes. *In re Estate of Sullivan,* 38

Ariz. 387, 300 Pac. 193. In view of the rule of the common law in regard to the admissibility of judgments in evidence, and the sound and indeed almost compelling reason supporting that rule, and of the revolutionary effect which a literal interpretation of the statute would have upon the law of evidence, we hold that under the consolidation of the two sections it was not the intention of the legislature to abolish the general rules regarding the admissibility of evidence, and the records referred to in section 4454, *supra,* are still subject, so far as such admissibility is concerned, to those rules, but that when, under those general rules, they, or properly certified copies thereof, are admitted, they are *prima facie* evidence of the facts stated therein. We think, therefore, the trial court erred in admitting the findings and award of the Industrial Commission for the purpose of proving that the injuries from which plaintiff was undoubtedly suffering were the result of an accident.

Was such error necessarily reversible however? There is ample evidence in the record, in the absence of the erroneously admitted evidence, to sustain the conclusion of the jury that the injuries of plaintiff were of an accidental nature as described in the policy of insurance issued him by defendant, and there is no substantial evidence to the contrary. The whole record impresses us strongly that were we to reverse the case on the ground of the erroneous admission of the finding and award, there is no reasonable probability that on a new trial any other result than that reached by the jury in the present case could be expected. We are therefore of the opinion that this case presents a proper instance for the application of article 6, section 22, of the Constitution. The judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.