[Criminal No. 802.   Filed June 25, 1934.]

[33 Pac. (2d) 985.]

LOUIS   SPRAGUE   DOUGLASS,   Appellant,   v.
STATE, Respondent.

Mr. William H. Westover and Mr. Bernard T. Caine, for Appellant.

Mr. Arthur T. La Prade, Attorney General, Mr. John Francis Connor, Assistant Attorney General, and Mr. Glenn Copple, County Attorney, for the State.

LOCKWOOD, J. — This is an appeal by Louis Sprague Douglass from a judgment of the superior court of Yuma county, dated October 3, 1933, which sentenced him to death by hanging, on the verdict of a jury finding him guilty of murder in the first degree and fixing the penalty of death.

The following facts regarding the case are undisputed: Defendant at the time of the trial was forty-seven years of age. Some time during the month of January, 1933, he, together with two other parties by the name of Doughty and O'Connell, left New York City for Arizona, arriving some time later at the Jack Hayden ranch in northern Yuma county. Upon their arrival they found Hayden living in his house and Ralph Hart, an elderly prospector, living close by in a tent. With Hayden's permission they made camp under a near-by tree, and for two weeks or more the visitors spent their time hunting and ex-

amining the Good Hope Mine, a property located in the immediate vicinity. On the 7th of February, 1933, defendant went out hunting, and upon his return found Hayden in front of his house and shot him. Hart at the time was in his tent near by and defendant called his two associates, who were at their camp, and directed them to carry Hayden's body into the house. After doing this, all three returned to their camp, where a discussion arose as to what should be done in regard to Hart. Finally it was agreed that Hart should be called out of his tent and tied up, and the three went to the tent for that purpose; but upon Hart's appearing, for some reason Doughty and O'Connell walked away, leaving defendant and Hart together, and a few minutes later defendant shot and killed Hart. It was his claim at the trial that both killings were done in self-defense. After the shooting, the bodies of Hart and Hayden were buried in the sand and defendant and his associates, without notifying anyone of the double tragedy, departed immediately for New York City. Shortly thereafter the bodies were discovered, and by various means the three were apprehended and brought back to Yuma county and jointly informed against for the murder of Hart. While in the county jail at Yuma county the three defendants, being separated, began writing notes one to the other, which were delivered by a trusty. This was discovered by the county attorney, and from that time on the notes were photographed without the knowledge of the prisoners and the originals were then delivered to the parties to whom they were addressed. A severance was later granted, and we are considering the trial of Douglass alone.

There are other matters of evidence which we shall refer to from time to time in the discussion of the twelve assignments of error.

The first assignment is that the court erred in overruling a challenge for cause to the juror Charles H. Curtis, upon his examination on *voir dire*. We have examined carefully the entire proceedings in regard to this juror and are satisfied that the allowance of the challenge was within the discretion of the court. While it would not have been an abuse of that discretion to allow the challenge, neither can we say that it was an abuse to refuse it. It appears from the examination that the juror had heard the matter of the killing discussed more or less and had been present at the proceedings held by the coroner's jury. On the other hand, he stated emphatically and explicitly that he had no fixed opinion in regard to the matter and would be guided only by the evidence which appeared upon the trial, and that he felt he could sit as a fair and impartial juror in every respect. One of the leading cases upon the qualifications of trial jurors is that of *Holt* v. *People,* 13 Mich. 224. In considering the proposition so often heard that the mind of the juror should be like a "blank sheet of paper" when he takes his place in the box, Judge COOLEY said in that case:

"It is secondly said that, in order to be qualified, a juror must come to the case with a mind entirely unimpressed with any opinion in respect to the guilt or innocence of the accused; and we are asked whether the existence of an opinion, to any degree, is consistent with the fairness and impartiality which the law demands in a juror.

"We find nothing in the authorities, nor are we able to discover any reason, favoring the rule thus indicated. To require that jurors shall come to the investigation of criminal charges with minds entirely unimpressed by what they may have heard in regard to them, or entirely without information concerning them, would be, in many cases, to exclude every man from the panel who was fit to sit there. With the present means of information, the facts or rumors concerning an atrocious crime are, in a very few

hours, or days at the farthest, spread before every man of reading and intelligence within the district from which jurors are to be drawn—and over the whole country, if the atrocity be especially great. And there are some crimes so great and striking, that even the most ignorant will have information and impressions in regard to them; and the rule, as stated, applied to such cases, would render the impaneling of a jury for their trial impossible, and make their very enormity a complete protection from punishment.''

We have considered the same question in the case of *Burnett* v. *State,* 34 Ariz. 129, 268 Pac. 611, and have held, under circumstances much stronger in favor of the allowance of the challenge than those shown in the present case, that the trial court did not abuse its discretion in refusing to grant it.

We consider together the second and fourth assignments of error, which deal with the admission of evidence relative to the alleged murder of Hayden by defendant, the condition of his body when it was found, the place where it was buried, and the examination of the body made by Dr. H. A. Reese, from which the latter testified as to the manner and cause of death. Defendant was informed against for the murder of Hart, and it is urged that the evidence in regard to the death of Hayden referred to a distinct and unconnected crime, and that it is therefore irrelevant and inadmissible. It is of course the general rule of law that evidence which shows the accused has committed another crime wholly independent of that for which he is on trial should not be admitted. *Greve* v. *State,* 36 Ariz. 325, 285 Pac. 274; *Comancho* v. *State,* 39 Ariz. 556, 8 Pac. (2d) 772. There are, however, certain exceptions, to this rule. We have had these exceptions under consideration many times and have stated that where evidence tends to establish (1) a motive for the crime for which defendant is on trial, (2) his intent, (3) the

absence of mistake or accident, (4) a common scheme or plan, and (5) the identity of the person charged with the commission of the crime on trial, it is admissible, notwithstanding it also shows another crime. *Crowell* v. *State,* 15 Ariz. 66, 136 Pac. 279; *Vigil* v. *State,* 33 Ariz. 51, 262 Pac. 14; *Holder* v. *State,* 31 Ariz. 357, 253 Pac. 629; *Lawrence* v. *State,* 29 Ariz. 247, 240 Pac. 863. In this case the defendant had previously to and at the trial admitted the killing of both Hayden and Hart, but contended that each was done in necessary self-defense. The question of self-defense was therefore one of the vital issues at the trial, and we think the previous killing, so closely connected in time and place with that for which the defendant was on trial, the condition of Hayden's body, the place and manner in which it was buried, and the manner and cause of his death, the doctor testifying that he was killed by a shot in the back of the head, all had a very material bearing upon the question of whether defendant's motive for killing Hart was self-defense or whether, as contended by the state, it was done in the attempt to conceal another brutal and cowardly murder. We conclude that the trial court properly admitted the evidence in regard to the Hayden killing.

This same ruling goes to assignment No. 3, which discusses the testimony of Dr. Reese in regard to the cause of Hayden's death. The substance of this testimony was that he was killed by being shot in the back of the head, a matter certainly very material upon the question as to whether the killing was done in self-defense and therefore something which Douglass would have had no cause for concealing, or whether it was a deliberate murder, in which case he would have the strongest motive for killing Hart in order to cover up the first crime.

The fifth assignment of error is that the court refused to permit one of the defendant's witnesses to

testify in regard to certain uncommunicated threats alleged to have been made by Hayden against defendant. Where the issue is self-defense, communicated threats are always admissible in evidence. *Sparks* v. *State,* 19 Ariz. 455, 171 Pac. 1182; *Stokes* v. *Territory,* 14 Ariz. 242, 127 Pac. 742. And if there is a question as to which of two parties was the aggressor in an affray which resulted in a killing, uncommunicated threats are also generally held to be admissible. *Wiggins* v. *Utah,* 93 U. S. 465, 23 L. Ed. 941. But these cases always refer to threats made against a defendant by the person for whose killing he is being tried, and in this case the alleged threats were made by a third party. We know of no case where such threats are held to be admissible.

The sixth assignment of error is that the court permitted defendant to be cross-examined in regard to certain letters and notes which were written and received by him while in the county jail in Yuma, when he had not referred to the letters in his evidence in chief. The defendant had taken the stand and had testified fully in regard to what he claimed to be the facts in regard to the killing of Hart and Hayden. In such direct examination he made statements which would raise the issues of self-defense and insanity, but in no way referred to the letters above mentioned. Upon cross-examination the state endeavored to question him as to whether or not he had written any of these notes, their contents being such as might cause a reasonable man to doubt the truth of his excuse for the killing. It is the contention of counsel that since the notes were not referred to on direct examination, it was not permissible for the state to question the defendant in regard to them on cross-examination.

It is the law in this jurisdiction that when the defendant takes the stand he may be cross-examined to the same extent and subject to the same rules as

any other witness. Section 5179, Rev. Code 1928; *Territory* v. *Davis,* 2 Ariz. 59, 10 Pac. 359; *West* v. *State,* 24 Ariz. 237, 208 Pac. 412. What, then, is the rule in Arizona in regard to the extent of the cross-examination of a witness? We have had this question directly and specifically before us in the case of *Rush* v. *French,* 1 Ariz. 99, 25 Pac. 816, 828. Therein we stated very definitely the law of Arizona in that respect, and this decision has never been over-ruled although there may have been cases in which rulings were made which apparently were not entirely in harmony with it, such as *Cline* v. *State,* 21 Ariz. 554, 192 Pac. 1071; *La Grange* v. *State,* 26 Ariz. 102, 222 Pac. 414. We think it is well that we restate the law of Arizona on this point in the case at bar. Generally speaking, there are two rules in regard to the cross-examination of witnesses. The first is the so-called English one. Under this, when a witness has been examined as to any material point in the case, the other party may cross-examine him as to the whole case, including new matter of defense, but the extent to which leading questions may be used is in the discretion of the court. This rule is followed in England and in a number of the American courts, such as Arkansas, *Bispham* v. *Turner,* 83 Ark. 331, 103 S. W. 1135; Georgia, *Ficken* v. *City of Atlanta,* 114 Ga. 970, 41 S. E. 58; Kentucky, *Bruton* v. *Edding-ton-Griffiths Const. Co.,* 118 S. W. 1001; Massachu-setts, *O'Connell* v. *Dow,* 182 Mass. 541, 66 N. E. 788; Michigan, *Cummings* v. *Detroit United Ry.,* 163 Mich. 304, 128 N. W. 206; Mississippi, *Mask* v. *State,* 32 Miss. 405; Missouri, *State* v. *Martin,* 229 Mo. 620, 129 S. W. 881, Ann. Cas. 1912A 908; North Carolina, *State* v. *Allen,* 107 N. C. 805, 11 S. E. 1016; South Carolina, *State* v. *Howard,* 35 S. C. 197, 14 S. E. 481; Tennessee, *Sands* v. *Southern Railroad,* 108 Tenn. 1, 64 S. W. 478; Virginia, *Richards* v. *Common-wealth,* 107 Va. 881, 59 S. E. 1104. The remainder

of the states of the Union, together with the federal courts, generally follow the so-called American rule, to the effect that the cross-examination must be confined to matters which have been brought out in direct, and if the cross-examining party wishes to obtain the testimony of the witness as to other matters, he must do so by calling him to the stand and questioning him under direct examination. These two rules were carefully compared and discussed in *Rush* v. *French, supra,* and we laid down the rule for Arizona as follows:

"When an adverse witness has testified to any point material to the party calling him, he may then and there be fully cross-examined and led by the adverse party upon all matters pertinent to the case of the party calling him, except exclusively new matter; and nothing shall be deemed new matter except it be such as could not be given under a general denial."

Were the matter before us as a question of first impression, we should be inclined to follow the English rule to its full extent. Courts are rapidly getting away from the old state of things where trials, particularly in criminal cases, were considered more as a game in which the chief object was to see that the various time honored rules of procedure were observed, rather than to determine the ultimate question of the guilt or innocence of a defendant. The modern tendency is to hold that rules of procedure were after all adopted only to aid the courts in discovering the true facts in regard to any particular case, and should be formulated with that end in view. Since such is the case, we think the proper rule to follow is the one which will best aid to produce that result, and that any rule which has the result of preventing the witness from disclosing fully and freely, on the suggestion of any person who has the right to question him, everything that he

may know bearing upon the material facts of a case, whether it favors the party calling him or his adversary, is essentially wrong, and any rule which has the contrary effect is presumptively right. As was well said by Dean Wigmore, in his monumental work on Evidence:

"For two centuries past, the policy of the Anglo-American system of Evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience. Not even the abuses, the mishandlings, and the puerilities which are so often found associated with cross-examination have availed to nullify its value. It may be that in more than one sense it takes the place in our system which torture occupied in the mediaeval system of the civilians. Nevertheless, it is beyond any doubt the greatest legal engine ever invented for the discovery of truth. However difficult it may be for the layman, the scientist, or the foreign jurist to appreciate this its wonderful power, there has probably never been a moment's doubt upon this point in the mind of a lawyer of experience. 'You can do anything,' said Wendell Phillips, 'with a bayonet—except sit upon it.' A lawyer can do anything with a cross-examination,—if he is skillful enough not to impale his own cause upon it. He may, it is true, do more than he ought to do; he may 'make the worse appear the better reason, to perplex and dash maturest counsels,'—may make the truth appear like falsehood. But this abuse of its power is able to be remedied by proper control. The fact of this unique and irresistible power remains, and is the reason for our faith in its merits. If we omit political considerations of broader range, then cross-examination, not trial by jury, is the great and permanent contribution of the Anglo-American

system of law to improved methods of trial procedure."

In view, however, of the length of time during which *Rush* v. *French, supra,* has been the law of Arizona, we do not now attempt to broaden the scope of the cross-examination, as defined in that famous case; but we certainly shall not narrow it. Tested by this rule, we think the questions objected to were clearly admissible as bearing on the truth of the defenses which had already been offered by defendant.

The seventh assignment of error was expressly waived by defendant in his brief, so we need not consider it.

The eighth assignment presents a more serious question. Defendant offered in evidence his discharge from service in the United States Army in 1916, which on its face stated that he was discharged for dementia praecox, hebephrenic form, on the theory that it would have probative value of his mental condition at the time of the offense wherewith he was charged. It is contended that this exhibit was admissible under section 4460, Revised Code of 1928, which reads as follows:

"§ 4460. Governmental records, authenticated copies. Copies of any records or documents belonging to and being in any of the governmental departments of the United States, authenticated as such, so as to entitle the same to be received as evidence in the courts of the United States, shall be received as evidence in the courts of this state."

We have held in the recent case of *Mutual Benefit H. & A. Assn.* v. *Neale,* 43 Ariz. 532, 33 Pac. (2d) 604, construing section 4454, Revised Code of 1928, which is of similar effect to section 4460, *supra,* that under such statutes the general law of evidence is not changed, and that copies are admissible only under the same circumstances and to the same extent that their original would be ad-

missible. The question then is whether the original discharge of defendant from service in the army would have been admissible for the purpose of proving that he was at that time suffering from dementia praecox, hebephrenic form. Counsel have cited a number of federal cases in which records of this nature were held admissible. *United States* v. *Cole,* (C. C. A.) 45 Fed. (2d) 339; *Sprencel* v. *United States,* (C. C. A.) 47 Fed. (2d) 501; *Sawyer* v. *United States,* (C. C. A.) 10 Fed. (2d) 416. These were all war risk insurance cases, and the records were held admissible under specific acts of Congress referring to such cases. The general rule is that documents of this nature are not admissible in evidence for the reason that they are hearsay in character. *State* v. *Shaw,* 75 Wash. 326, 135 Pac. 20; *Toole* v. *Franklin Inv. Co.,* 158 Wash. 696, 291 Pac. 1101. We therefore hold that the court properly excluded the copy of the certificate of discharge from the consideration of the jury, as being merely hearsay statements of the opinion of certain medical officers in regard to the mental condition of defendant at the time of his discharge from the army in 1916.

The ninth assignment of error is that the court refused to admit in evidence a certain written document purporting to be an examination of defendant made by the police officials of New York about the time of his arrest there. It is urged in support of this argument that when the state attempts to offer a confession or statement of a defendant in evidence, the whole should be offered and not merely a part thereof. This is generally true. *Morehead* v. *State,* 34 Ohio St. 212; *Coon* v. *State,* 13 Smedes & M. (Miss.) 246; *State* v. *Porter,* 32 Or. 135, 49 Pac. 964; *People* v. *Murphy,* 39 Cal. 52. Apparently the state was about to lay a foundation on cross-examination for impeachment of the defendant and he was asked

whether or not he did not make certain statements in New York. Had a part only of this statement been admitted in evidence on an offer of the state for the purpose of impeaching the defendant, a different question would have arisen. But none of it was ever offered by the state. When the defendant himself offered it, it was properly rejected as being a self-serving declaration. *Hadley* v. *State,* 25 Ariz. 23, 212 Pac. 458.

Assignment No. 10 refers to certain statements made by the county attorney in his argument to the jury. It is urged that this appealed to the passion and prejudice of the jurors and referred to matters not appearing in the record. We have examined carefully the entire argument of the county attorney, but since it will be of no value as a precedent in other cases we do not quote it. While it was impassioned and vehement, we cannot say that any of the remarks which were objected to at the time of the trial by defendant were not based upon matters which appeared in the evidence.

The eleventh assignment of error is that the court coerced the jury into reaching a verdict by remarks which it made. It appears that after the case was submitted to the jurors at 7:30 P. M., Friday, the 22d of September, they came into the court and asked for further instructions. The court stated that under the law he was not permitted to give them further instructions, but that he would re-read the instructions already given, which he did, and then said as follows:

"The Court: Very well. I believe before I will dismiss you, gentlemen, that I really owe it to the jury as one gentleman to another to state to you I will not be in the city tomorrow. It is to be hoped, of course, in the meanwhile you will arrive at a verdict. But I wanted to make this explanation to you with the idea that if and when you do agree upon

a verdict you will not be disappointed because the Judge of the Court does not happen to be here at the moment to receive it. It will be necessary in that contingency for you to wait until I return, which will probably be late tomorrow afternoon, or some time in the night. I do not wish by that statement, gentlemen, to in any wise influence you to be hurried or to coerce you in arriving at a verdict, but I make that explanation only with the idea you will arrive. at a verdict, and I want you to understand the reason why you cannot be promptly brought into court tomorrow, if you do arrive at such a verdict and by reason thereof send for the Court to convene. With that, gentlemen, you may now be excused to deliberate further upon your verdict. The bailiffs will now take you in charge.''

It is urged that this was in effect coercion of the jury by compelling them to return a verdict. In the case of *Pfeiffer* v. *State,* 35 Ariz. 321, 278 Pac. 63, we held that certain remarks made by the trial judge in informing the jury that he would hold them together till they reached a decision did constitute prejudicial error, as being an indication by the judge of his opinion as to the guilt or the innocence of the defendant, and reversed the case for that reason. No such construction can be given to the remarks in the present case. They were simply a statement that the judge would not be present until late in the succeeding day, and a careful cautioning of the jury that he did not wish to coerce or influence them in any way in regard to their verdict, but merely was explaining why, in case they did reach a verdict while he was gone, there would be some delay in receiving it.

The twelfth assignment of error was that the court refused to give the following instruction:

''The jury are instructed that the State having introduced the statement made by the defendant, Douglass, to the County Attorney as the truth, the

explanation given of the shooting by the defendant, Douglass, must be taken as true unless the falsity of such explanation is shown by other facts and circumstances in the evidence.''

It is contended that the law is that when the state introduces a statement or confession made by a defendant in regard to a crime, the entire statement, including the explanation or excuse given by the defendant, if any, must be taken as true unless its falsity is established by other facts and circumstances. So far as we know, this rule is found only in the state of Texas. It was first laid down in the case of *In re Pharr*, 7 Tex. App. 472, and some of the trial courts of Texas from that time on assumed that whenever a confession of the defendant was introduced in evidence such an instruction must always be given. In the case of *Cook* v. *State*, 71 Tex. Cr. R. 532, 160 S. W. 465, the Court of Criminal Appeals took occasion to discuss the true meaning of the rule laid down in the Pharr case, and stated that this case did not hold such a charge must always be given when requested, but that it was only required when the state relied for conviction upon the admissions and confessions of the accused alone. Even assuming, without admitting, that the rule followed in Texas correctly states the law, we think it does not apply to the present case. The test laid down by the courts of that state is, in substance, ''assuming the confessions or statements to be stricken from the records, is there enough evidence remaining to sustain a verdict of guilty?'' In the present case, excluding all statements made by the defendant, the state introduced sufficient evidence to sustain a verdict of guilty. Further, the court gave very full and complete instructions on self-defense. We think that under any circumstances this sufficiently presented to the jury the question as to whether the exculpatory

statements made by defendant were true or not, for they could not have found under these instructions that the defendant did not act in self-defense, without also having found that his exculpatory statements were untrue.

This concludes the assignments of error. We have examined the record carefully and painstakingly and are convinced that there is nothing therein which would indicate that the defendant did not have submitted to a fair and impartial jury, and in the manner provided by law, the issue of whether or not he did murder Ralph Hart without justification or excuse, and the jury resolved that issue against him. The evidence being sufficient to sustain the verdict, it is conclusive so far as we are concerned.

We think in passing we should say, in justice to counsel for the defendant, that they were appointed by the court to represent him during the trial of this case, and the record shows that they gave him as full and complete a defense as could possibly have been made under the circumstances of the case, and that they have, in a most careful and painstaking manner, briefed in this court every possible question which might be raised herein in order to secure a reversal of the case. They have done their full duty in the premises, and it is not their fault that we have been obliged, upon the law and the evidence, to affirm the judgment.

There remains but one question for our consideration. The judgment of the trial court sentenced the defendant to death by hanging. We have held in the cases of *Hernandez* v. *State,* 43 Ariz. 424, 32 Pac. (2d) 18, and *Shaughnessy* v. *State,* 43 Ariz. 445, 32 Pac. (2d) 337, that in cases of the infliction of the death penalty after the adoption of the recent constitutional amendment, all death penalties in Arizona must be inflicted by lethal gas.

The judgment is modified to provide that the punishment of death therein set forth be inflicted by lethal gas, and as so modified is affirmed.

ROSS, C. J., and McALISTER, J., concur.