**SUHAY et al. v. UNITED STATES.**

No. 1589.

Circuit Court of Appeals, Tenth Circuit.

April 5, 1938.

Rehearing Denied April 25, 1938.

Wm. H. McHale, of Kansas City, Kan., and John Kramer, of Kansas City, Mo. (Verne D. Edwards, of Kansas City, Mo., and Harold D. Thomas, of Washington, D. C., on the brief), for appellants.

Summerfield S. Alexander, U. S. Atty., of Topeka, Kan. (R. T. McCluggage, Homer Davis, and Gordon Sloan, Asst. U. S. Attys., all of Topeka, Kan., on the brief), for appellee.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

Appellants Robert J. Suhay and Glen J. Applegate were charged by indictment with the murder of Wimberly Wayne Baker in the post office building at Topeka, Kan. In submitting the case to the jury, the court instructed on murder in the first degree and murder in the second degree; and the jury was appropriately advised that in the event appellants were found guilty of murder in the first degree, the verdict could be qualified by adding thereto the words "without capital punishment." Separate verdicts were returned finding them guilty of murder in that degree, but the qualification was not added and sentences of death followed.

In April, 1932, appellant Suhay was sentenced in New York to a term of imprisonment of from six to twelve years for attempted robbery in the second degree, and he was paroled in March, 1936. In December, 1930, appellant Applegate was sentenced in the same state to a term of from five to ten years for robbery in the second degree, and he was paroled in November, 1936. The paroles were forfeited on April 9 and June 12, 1937, respectively. Appellants became acquainted in prison and they associated together in New York City after being paroled. On the morning of March 12, 1937, appellant Applegate intrigued a salesman of Buick automobiles to drive him to 64 Riverside drive on the pretext that he was in the market to purchase an automobile and desired a demonstration. When they reached the address, appellant Applegate induced the salesman to accompany him to his room on the third floor. Appellant Suhay was in the room. Appellants immediately drew guns on the salesman, told him it was a stickup, tied his wrists and elbows behind him, gagged and bound him around the face and neck, removed his shoes and bound his ankles to the base of the chair, and told him they wanted his automobile. They took his driver's license, his Legion card, and the keys to the automobile and left. The automobile was gone when the salesman freed himself and went downstairs. About three hours later, appellants and a third person held up and robbed a bank in Katonah, N. Y., of more than $18,000. On the same day—apparently soon after the robbery—appellant Suhay and a companion

driving a Buick automobile stopped Alexander Ziring on the highway at a point about a mile from Katonah. With a gun in his hand, appellant Suhay told Ziring and his companions to get out and be quick about it; they did so, Ziring having his hands up; and appellant Suhay and his companion fled in the Ziring car. Appellants then traveled together in several states. Appellant Applegate purchased two pistols in Dayton, Ohio, one on March 24th, and the other on April 2d, using a fictitous name in each instance. They purchased two identical Buick automobiles in Cleveland on April 5th, each using a fictitious name. They arrived at Kansas City, Mo., in the automobiles thus purchased, on the afternoon of April 15th. They registered at a hotel under fictitious names and their automobiles were placed in a garage.

A complaint was filed with the United States Commissioner for the Southern District of New York, charging appellants with the robbery of the bank at Katonah and a warrant was issued. Baker, Martin, and Farland, special agents of the Bureau of Investigation, were advised that the warrant had been issued, that it was believed one of the accused would call for mail at the post office in Topeka, and that the other probably would be with him; and the officers were stationed there with directions to apprehend them if they appeared. Appellants went from Kansas City to Topeka on the morning of April 16th in one of the Buick automobiles, leaving the other in the garage. They walked into the lobby of the post office together and while appellant Applegate lingered, appellant Suhay went to the general delivery window and called for mail under the name of Rudolph Brinker. The clerk handed him two letters, one of which contained a newspaper clipping, stating that the two were wanted for robbery of the bank at Katonah. He left the window and walked to a nearby table in the lobby. About five minutes later, appellant Applegate went to the window and called for mail under the name of Louis Moore. The clerk laid one letter on the shelf of the window and told him that the other was a special delivery for which he would have to sign. The clerk thereupon flashed a prearranged electric signal. Baker immediately left his position, walked to appellant Applegate with his pistol in his right hand, placed his left hand on appellant Applegate's shoulder, and said, "Put them up, Moore, higher, higher," or "Stick them up, you are under arrest," or words of similar import, the testimony differing as to the exact words used. Appellant Applegate turned slowly toward Baker with his hands about shoulder-high and with his right hand in position to strike. Baker quickly placed his left hand on appellant Applegate's chest and under his left arm as if searching for a gun. Appellant Suhay thereupon walked up behind Baker and said, "What is this all about," or "You can't get away with this." Baker turned his head and appellant Suhay shot at him. When Baker turned his head, appellant Applegate drew his gun and also shot at Baker. Baker fell wounded, and died the next day; and his pistol subsequently showed that one shot had been fired from it. Appellants retreated out of the lobby, but continued to shoot at the prostrate form as they ran. Martin was stationed at a different place in the lobby, and he did not see the electric signal. He fired at appellants as they ran, and followed them out of the building. They emptied their pistols as they retreated in the lobby and ran across the street to their parked automobile. Appellant Applegate slipped a clip of cartridges into his gun while they were crossing the street, and they fired two shots at Martin after they entered the automobile, one being fired through the rear window. Appellant Suhay was wounded in the left wrist and his wrist watch was shot away. They fled northward. Their automobile was overturned and wrecked near Sabetha, Kan. Appellant Applegate drew his gun on a passing farmer and compelled him to take them to his home and to summon by telephone his family physician at Sabetha. The physician arrived within a few minutes; appellant Applegate told him that they had been in a shooting affray; that one of them had been wounded; and that they desired the physician to dress the wound. The physician and appellant Applegate went to Sabetha for tetanus antitoxin. Appellant Applegate sat facing the physician throughout the trip with his gun in his pocket. After they returned, the physician treated the wound; they paid the farmer for the food his wife had prepared and served them; and appellant Applegate gave him a conveyance for the wrecked automobile. The physician stated that his charge was

$10; they gave him $20; and they told him that there was about $7,000 in the hotel at Kansas City, and that he could have it if he would go there and get it. They then took his automobile and continued their flight. They were placed under arrest that night at Plattsmouth, Neb. Appellant Applegate had more than $2,800 in currency on his person, and appellant Suhay had slightly less than $2,000 on his person; and about $7,000 in currency was found in their baggage at the hotel in Kansas City. Some of the money found on appellant Applegate's person and some of that found in the baggage had been shipped by the Federal Reserve Bank in New York to the bank at Katonah shortly before the robbery. One of the pistols purchased in Dayton was taken from the person of appellant Suhay at the time of the arrest, and the other was found on the seat of the automobile beside appellant Applegate. Appellants made separate verbal and written statements after their arrest. They denied that they participated in the robbery of the bank at Katonah; but admitted that they had violated their paroles; that Baker stepped up to appellant Applegate with his pistol in his right hand, placed his left hand on appellant Applegate's shoulder and said, "Put up your hands, Moore, put them up higher, higher"; that appellant Applegate turned and Baker felt under his breast and under his left arm as though searching for a gun; that appellant Suhay then walked up behind Baker and said, "What's this about," or words to that effect; that Baker then turned his head toward appellant Suhay; that the shooting followed; that they believed Baker fired the first shot; that each shot at Baker; and that they emptied their guns in the lobby and as they fled out of the building and across the street. Appellant Suhay stated to a special agent that he intended to use the pistol purchased in Dayton on any one that accosted him for the purpose of taking him into custody for return to New York to complete his sentence there; that he thought Baker was a plain-clothes officer at Topeka attempting to arrest Applegate, for the violation of his parole; that he further thought if appellant Applegate was arrested he would be also; and that he approached Baker from behind with his gun for the purpose of preventing Baker from taking appellant Applegate into custody.

Appellant Applegate stated to a special agent that he thought Baker was a local officer at Topeka attempting to make a chance pickup; and that he further thought they could shoot their way out with him, get two or three states away, and thus be free from having to return to prison in New York.

The first complaint made is that the court permitted the government to introduce a vast amount of unnecessary, irrelevant, incompetent, and highly prejudicial evidence after the homicide had been clearly established. It is said that such evidence incited the hatred, bias, and prejudice of the jury. The contention was not presented to the trial court by objection, exception, motion, or otherwise. It is raised here for the first time. Ordinarily, an error occurring during the trial must be called to the attention of the trial court in order to be reviewed on appeal. But where life or liberty is involved, an appellate court may notice a serious error which was plainly prejudicial even though it was not called to the attention of the trial court in any form. Strader v. United States, 10 Cir., 72 F.2d 589; Jaramillo v. United States, 10 Cir., 76 F.2d 700. This being a capital case, we disregard the omission to present the question to the court below.

There were between forty-five and sixty persons in the lobby of the post office at the time the fatal shooting occurred. The clerk at the general delivery window, a clerk at the money order window, the superintendent of mail, a mail carrier, Martin, the special agent, and four other persons who were in the lobby testified to facts which immediately preceded the homicide or attended it. In addition, the postmaster testified that he found the strap of a wrist watch in front of the c.o.d. window, and that it had blood on it; the janitor testified that immediately after the shooting he found a letter on the floor with the name Rudolph Brinker on it, and that there was blood on the floor; and a third witness testified that he traced blood on the floor from a point near a certain table in the lobby out through the front door and down the steps. Seven special agents for the Bureau of Investigation testified to statements made by the appellants after their arrest. Some of the statements were made at Plattsmouth, some en route from Plattsmouth to Omaha, and some at Kansas City. Some of the agents heard the statements made at one place and others heard those made at other places.

894

No agent was present at all of the places and heard all of the statements. The testimony presented some overlapping and duplication, but all of it related to relevant and material facts. There was no effort to unduly pyramid evidence for the deliberate purpose of unfair emphasis or to incite the passion or prejudice of the jury. Furthermore, the number of witnesses permitted to testify to a single fact and the extent to which cumulative evidence shall be received rests within the sound judicial discretion of the trial court. Samuels v. United States, 8 Cir., 232 F. 536, Ann.Cas.1917A, 711; Chapa v. United States, 5 Cir., 261 F. 775; State v. Lyle, 125 S.C. 406, 118 S.E. 803; Hall v. State, 64 Ark. 121, 40 S.W. 578; Sheppard v. State, 120 Ark. 160, 179 S.W. 168; State v. Otrey, 22 N.D. 128, 132 N.W. 367; State v. Chambers, 179 Iowa 436, 161 N.W. 470; Chappell v. State, 197 Ind. 272, 150 N.E. 769. It would be a far cry to say that the admission of that part of the evidence which can be regarded as cumulative constituted an abuse of discretion.

■ Next, it is urged that the court erred in admitting in evidence the clothes worn by Baker at the time of the homicide. It is well settled that in the trial of a homicide case, the clothes worn by the deceased should not be admitted in evidence where they do not tend to solve any controverted issue; but it is an equally inveterate rule that they may be introduced and exhibited to the jury if they are helpful in establishing the position of the parties, their distance apart, the number of shots fired, or the location from which the shots came, or to prove or elucidate any other matter material to the inquiry. State v. Willis, 152 La. 784, 94 So. 395; Hyche v. State, 217 Ala. 114, 114 So. 906; People v. Wright, 89 Mich. 70, 50 N.W. 792; Dobbs v. State, 39 Okl.Cr. 368, 265 P. 661; People v. Wilson, 342 Ill. 358, 174 N.E. 398; Graham v. Commonwealth, 127 Va. 808, 103 S.E. 565; State v. Malone, 333 Mo. 594, 62 S.W.2d 909; Pelfry v. Commonwealth, 255 Ky. 442, 74 S.W.2d 913; Langford v. State, 123 Tex. Cr.R. 171, 58 S.W.2d 115; State v. Kingsley, 137 Or. 305, 2 P.2d 3, 3 P.2d 113; State v. Barclay, 46 S.D. 129, 191 N.W. 186; State v. Griffin, 218 Iowa 1301, 254 N.W. 841; Commonwealth v. Talarico, 317 Pa. 481, 177 A. 1. These clothes were offered by the government as a part of its case in chief. Both appellants were charged with the homicide, and both had pleaded not guilty. Their plea put in issue every material allegation of the indictment. They could sit mute and challenge the sufficiency of the evidence. It was essential to the conviction of both of them that the government show that both participated in the homicide or that one committed it and the other acted in concert with him. Both were guilty as principals if one fired the shot or shots pursuant to a common purpose or design and the other aided or abetted him. 18 U.S.C.A. § 550; Gooch v. United States, 10 Cir., 82 F.2d 534; Territory v. McGinnis, 10 N.M. 269, 61 P. 208. The testimony disclosed a bullet wound in the back, one in the right arm, one in the right chest, and one in the left side. One physician testified that a certain bullet was traced through the body, but he was uncertain as to which wound was the point of entrance and which the point of exit. Based upon their examination of the clothes, the experts gave their opinion concerning the points of entrance and exit. The clothes clearly elucidated the facts respecting the number of shots that struck Baker and the direction from which they came, and thus tended to show that appellants acted in concert in the commission of the crime.

■ The action of the court in admitting evidence concerning the commission of the several crimes in New York on March 12th, particularly the robbery of the bank, is challenged. Stress is laid upon the point that the evidence established offenses separate, distinct, and independent of the one charged in the indictment; and that it was prejudicial. It is fundamental that an accused cannot be convicted upon proof that he committed another offense; and it is axiomatic that ordinarily evidence of a crime wholly separate, independent, and without any relation to the one laid in the indictment is not admissible. But relevant evidence which tends to prove a material fact should not be excluded merely because it shows or tends to show that the accused committed another offense at a different time and place. The test in measuring the admissibility of evidence is whether it is material to any issue in the case on trial. If so, it should not be rejected even though it establishes the commission of another crime. The evidence relating to the offenses committed in New York was material upon the question of motive for the homicide. It tended to show that appellants killed the deceased with deliberation, premeditation, and malice aforethought for the purpose of avoiding arrest for return to

that state for prosecution. McHenry v. United States, 51 App.D.C. 119, 276 F. 761, 34 A.L.R. 1109; Eagles v. United States, 58 App.D.C. 122, 25 F.2d 546; People v. Wilson, 117 Cal. 688, 49 P. 1054; State v. Walters, 105 Or. 662, 209 P. 349; Graham v. Commonwealth, 164 Ky. 317, 175 S.W. 981; People v. Watkins, 309 Ill. 318, 141 N.E. 204; People v. Doody, 343 Ill. 194, 175 N.E. 436; People v. Scheck, 356 Ill. 56, 190 N.E. 108, 91 A.L.R. 1472; Shelton v. State, 106 Ohio St. 243, 140 N.E. 153; Anderson v. State, 205 Ind. 607, 186 N.E. 316; State v. Calloway, 174 La. 134, 140 So. 2; Douglass v. State, 44 Ariz. 84, 33 P.2d 985; Marsh v. State, 183 Ark. 1, 34 S.W.2d 767. The court instructed the jury at the time the evidence was admitted and again in the general instructions that it was admitted and could be considered solely and exclusively as bearing the question of motive. It must be presumed that the jury followed the instructions and took the evidence into consideration only for the permitted purpose.

■ Error is assigned upon the refusal to give a requested instruction (No. 13) that if Baker attempted to arrest appellant Applegate without communicating the fact that he was an officer, and appellant Applegate did not know that he was such officer, the attempted arrest was an unlawful act and the verdict should be manslaughter. An agent of the Bureau of Investigation is expressly authorized by statute to make an arrest without a warrant for a felony that is cognizable under the laws of the United States if he has reason to believe that the person arrested is guilty of such felony and there is likelihood that such person will escape before a warrant can be obtained. 5 U.S.C.A. § 300a. Baker had information that appellants had robbed the bank at Katonah, and that a warrant had been issued for their arrest. He was clearly warranted in attempting to make the arrest. A known officer is not required to disclose in advance his character or authority to the person about to be arrested. His known official character is enough in the first instance to require submission until formal notice of authority and intention to apprehend can be given. State v. Shaw, 104 S.C. 359, 89 S.E. 322; Dale v. Commonwealth, 186 Ky. 510, 217 S.W. 363; State

v. Peters, Mo.Sup., 242 S.W. 894; Heinzman v. State, 45 Okl.Cr. 305, 283 P. 264; State v. Krakus, 5 Boyce, Del., 326, 93 A. 554. The official character of Baker was unknown to appellants, but according to the uncontroverted and uncontradicted evidence they believed he was an officer engaged in an attempt to arrest one of them. That belief required submission in the first instance until formal declaration of authority could be given in like manner as though his official character was known. The attempted arrest was not unlawful, and since appellants believed Baker was an officer, failure to announce his official character did not reduce the homicide to manslaughter. The requested instruction was inapplicable to the evidence, and for that reason it was properly refused.

■ One contention remains. It presents the sufficiency of the evidence to support the verdict. It is argued that the evidence fails to show deliberation, premeditation, and malice aforethought; that instead it affirmatively shows that Baker suddenly appeared on the scene with a drawn gun; that appellants were taken completely by surprise; and that they acted upon the impulse of the moment. On the contrary, the evidence with its reasonable inferences was sufficient to warrant the jury in finding that the appellants had violated their respective paroles from prison in New York and were subject to apprehension for return to complete their sentences; that they had committed the several crimes in that state on March 12th and were subject to arrest and return for prosecution; that they mutually intended and agreed to resist arrest, and if necessary to take the life of any officer who sought to arrest them rather than to submit to arrest and be returned; and that in the fulfillment of that intention they deliberately, premeditatedly, and with malice aforethought shot the deceased when he undertook to arrest one of them. Homicide committed in such circumstances constitutes murder in the first degree.

The judgment is affirmed. The day fixed for the execution having passed, the cause is remanded with directions that the trial court cause appellants to be brought before it, and that it then fix a day for the execution of the judgment and sentence.