419 P.2d 362

**M. O. SIMPSON and Star Simpson, husband and wife, Appellants,**

**v.**

**Margarete HEIDERICH, Appellee.***

**2 CA–CIV 61.**

Court of Appeals of Arizona.

Oct. 21, 1966.

Rehearing Denied Nov. 30, 1966.

Review Denied Dec. 27, 1966.

* This appeal was filed with the Arizona Supreme Court and assigned that court's No. 7952. The matter was referred to this court pursuant to A.R.S. Section 12–120.23.

Murphy & Vinson, by James M. Murphy, Tucson, for appellants.

Miller & Pitt, by Robert F. Miller, Tucson, for appellee.

HATHAWAY, Judge.

M. O. Simpson and Star Simpson, husband and wife, were defendants in a personal injury action tried in superior court, Pima County, Arizona, and have appealed from a judgment entered on a jury verdict in favor of the plaintiff, Margarete Heiderich.

The appellants, owners of the Willow Spring Ranch located near Oracle in Pinal County, Arizona, hired the appellee, Mrs. Margarete Heiderich, as cook and housekeeper on November 10, 1960. One of her duties was to prepare food for two Rhodesian Ridgeback dogs who were on a special diet for breeding purposes.

On December 1, 1960, while the Simpsons were away on a trip, the dogs became excited when two men came to the front door. The dogs rushed into the kitchen, one of them jumped on Mrs. Heiderich and the other ran between her legs, causing her to fall whereby she sustained injuries to her left knee. The grounds upon which reversal is sought are (1) misconduct of a juror, (2) failure to furnish a medical report, and (3) a psychiatrist's testimony.

## MISCONDUCT OF JUROR

During the course of the trial, one of appellee's witnesses encountered a juror away from the courtroom and a conversation ensued. Appellee's counsel, upon learning of the conversation, reported its occurrence to the court. The witness testified in chambers and at subsequent contempt proceedings that the juror had commented "tell the woman she hasn't anything to worry about, we are going to decide in her favor," and other remarks in that vein. The juror denied making any statement relative to the outcome of the case. Both denied, under oath, that there was any prejudicial influence or intent to cause such. There was no showing of any attempt to influence the juror.

The appellants assign error to the trial court's refusal to grant the appellants' motion for a mistrial in view of the witness' discussion with the trial juror.

■■■ We note that the verdict was unanimous and the result would have been the same even if the offending juror had voted contrary to the majority. There is no showing that any of the other jurors were influenced by the juror's misconduct nor that the appellants were prejudiced in any way. We cannot assume prejudice. In the absence of a showing of prejudice we will not regard the misconduct of the juror as prejudicial. Anderson v. Pacific Tank Lines, Inc., 52 Cal.App.2d 244, 126 P.2d 153, 156 (1942).

■■■ Counsel for the appellee has cited the following which we feel is pertinent:

"Misconduct of a juror or jurors warrants a new trial only where the verdict was, or probably was, influenced thereby to the prejudice of the complaining party; and accordingly a new trial is not warranted where it is not shown that the verdict was in any way influenced or that there was even a remote possibility of its being so influenced by the misconduct of the jury." 66 C.J.S. New Trial § 61.

Also:

"If the facts as to misconduct leave room for a reasonable supposition that even a single juror may have been influenced thereby, it will not be disregarded as harmless, *except in those states where unanimous verdict is not required, in which case misconduct will be deemed harmless if a sufficient number assent to the verdict to sustain it, excluding those who were in any way cognizant of, or affected by, the misconduct,* or if the juror in connection with whom the claimed misconduct occurred in fact voted against the verdict returned for the appellee." 5B C.J.S. Appeal and Error § 1780. (Emphasis supplied)

■ The rule has been enunciated in Arizona that any prejudice to a litigant must be "affirmatively probable" to constitute grounds to set aside the verdict or grant a new trial. Jacob v. Miner, 67 Ariz. 109, 113, 191 P.2d 734 (1948); Webb v. Hardin, 53 Ariz. 310, 313, 89 P.2d 30 (1939). In view of the fact that the verdict was unanimous and the experienced trial judge determined that no prejudice had resulted, we are not disposed to disturb his ruling. We assume that the appellants' counsel has been unable to find authority in support of his position since he cites none.

Though no prejudice is shown in the record of this case, it is imperative that the integrity of juries remain unassailable. Jurors must avoid the very appearance of corruption in discharging their duty. We endorse the trial court's thorough inquiry and approve of the sanctions imposed.

## MEDICAL REPORT

The appellants next claim that the court abused its discretion and committed reversible error by allowing the testimony of a psychiatrist who had failed to furnish them with a medical report of his findings. It appears that the appellants' attorneys had caused an orthopedic examination of appellee to be made and had furnished a report of that examination to her counsel.

Written demand was then made under A.R.C.P. Rule 35(b), 16 A.R.S. requesting that the appellee furnish appellants' counsel "with any and all reports of medical examinations previously or hereafter made of Mrs. Heiderich."

Rule 35(b) provides in part:

"1. If requested by the person examined, the party causing the examination to be made shall deliver to him a copy of a detailed written report of the examining physician setting out his findings and conclusions. After such request and delivery the party causing the examination to be made shall be entitled upon request to receive from the party examined a like report of any examination, previously or thereafter made, of the same mental or physical condition. If the party examined refuses to deliver such report the court on motion and notice may make an order requiring delivery on such terms as are just, and if a physician fails or refuses to make such a report, the court may exclude his testimony if offered at the trial."

After the case had been set for trial, Doctor Lindsay Beaton, a psychiatrist, examined the appellee but the appellants were not furnished with a report of his examination pursuant to their request. When the doctor was called to testify at trial, appellants' counsel invoked Rule 35(b) as grounds for excluding his testimony.

Appellee's counsel points out that the appellants' counsel were alerted to the psychiatric aspects of the case by other medical reports supplied to them by the appellee and by Dr. Warren D. Eddy who had examined the appellee at the appellants' request and had reported:

" * * * it is rather obvious at the present time that *she has a tremendous functional overlay* which makes accurate evaluation of the severity of her symptoms impossible. Her physical findings tend to belie anymore than a mild amount of disability as a result of her pathology." (Emphasis supplied)

The other reports contained pointed references to a mental disability. Dr. Neumann's report, received by appellants on August 8, 1962 stated:

"She subsequently saw Dr. Charles Elkins who diagnosed 'psychic shock.' The patient adds that when she lies down she hears 'carnival noises' in her head and at times must sit up half the night."

\* \* \* \* \* \* .

"In conclusion, I believe *that most of the patient's symptoms at this time are on a functional basis. I believe that this is best characterized as an agitated depression of a reactive nature. I believe further that the patient should have definitive therapy for this condition; I would recommend that she be placed on one of the anti-depressant drugs.*" (Emphasis supplied)

Dr. Price's report, received by appellants on August 8, 1962 stated:

"The diagnoses were: Severe Contusion and hematoma of the left leg, laceration of the scalp, *post-traumatic syndrome secondary to the above injuries* and the circumstances under which they occurred, mild anemia and possible mild cystitis.

\* \* \* \* \* \*

"She was referred to the neurosurgeon Charles W. Elkins, M.D., for a consultation. Dr. Elkins informed me that he felt the patient was *suffering from psychic results of her accident and the fright which followed the accident.*

\* \* \* \* \* \*

"She had shown some improvement during the five months she was under my care, but I would anticipate that she will continue to suffer from the effects of the accident and the *psychic trauma* for perhaps another year." Emphasis supplied)

At the pretrial conference, appellants' counsel should have been aware of the fact of Dr. Beaton's psychiatric examination when he refused to stipulate to medical expenses of the appellee. These included

the bill of Dr. Beaton which was set forth in the itemized statement of claimed damages in the appellee's pretrial memorandum. At pretrial the appellee's attorney opposed appellants' request for a continuance on the ground that some of the doctors listed on the pretrial memorandum, Dr. Beaton among them, would be witnesses for the appellee and had been committed to a definite date for their appearance in court. The requested continuance was denied for that reason.

■ We agree with appellants that Rule 35(b) imposed a duty upon appellee's counsel to deliver Dr. Beaton's report (existence of which is not disputed) to appellants. This rule is an important discovery tool. The whole object of discovery is that mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451, 460 (1947).

■■ The present wording of Rule 35 (b) supports the trial court's ruling. The only instance in which exclusion of medical testimony is authorized is when the doctor himself failed or refused to make such report after being ordered by the court to do so. Since the court's discretion to exclude the testimony could be exercised only after (1) refusal of the examining party to deliver the report, (2) motion and notice, (3) an order requiring delivery and (4) the physician's failure or refusal to comply, the trial court properly overruled appellants' objection to Dr. Beaton's testifying. In so holding, we do not mean to imply that we sanction concealment or evasion of discovery procedures, but unfortunately the subject rule as drafted vests the trial court with no authority to reject the medical testimony under the circumstances of this case.

It behooves us to point out that the question raised in this appeal would have been obviated if this subject had been adequately covered in the pretrial conference. Rule 16(a) (4), Rules of Civil Procedure, 16 A.R.S., specifies "The limitation of the number of expert witnesses" as one of the subjects to be taken up at a pretrial conference. The identical provision is contained in the counterpart federal rule of civil procedure. Were this done, both parties would have been enlightened as to the names and number of expert witnesses to be called. A modicum of diligence on the part of counsel would have resulted in production of the withheld report, thereby eliminating the possibility of the element of surprise and objection under Rule 35 to the testimony of Dr. Beaton.

## TESTIMONY OF PSYCHIATRIST

The attorneys take opposing views as to whether Dr. Beaton was consulted for the purpose of treating appellee or testifying at trial. Apparently the trial court found that the primary purpose was treatment and we believe that the record supports this conclusion. Therefore our consideration of the appellants' arguments will be based on Dr. Beaton's status as a treating physician. The admission of the doctor's testimony as to the appellee's history related by her during consultations and otherwise unsupported in the evidence is assigned as error.

The history related by the appellee and retold on the stand by Dr. Beaton included a narrative of the circumstances and details of the occasion of her injury; her reaction to the injuries and her expressed fear that she was not covered by industrial insurance; the possibility of the loss of her social security benefits and that, perhaps, she would be unable to become a citizen because of indebtedness. The doctor testified that the appellee demonstrated a strong responsibility toward the job she had taken with the appellants. In order to explain the effect of the anxiety created by her inability to perform her job and the functional overlay thereby created, in his opinion, he related the early background of the appellee, including her strong desire to please her father and to show her worthiness. Tragic experiences were related, including the loss of an epileptic child who was killed in a Nazi euthanasia program and the loss of her husband who was executed by the Nazis.

The doctor opined that the appellee had "unconsciously built up a self-image of a responsible, reliable hard-working person whose life has been built about this," and due to the period of disability "she has become unconsciously but entirely genuinely convinced she no longer can work, and has become depressed, anxious and convinced that she would never be able to serve any of the purposes around which she has constructed her whole life." He concluded that her injuries had broken down her "life-long defenses and made her a neurotic invalid."

■■■■ Appellants claim that the testimony of the doctor as to statements made to him by appellee were hearsay and therefore inadmissible. It is true that the doctor's testimony as to such statements was inadmissible to prove the truth of the facts therein contained. But here Dr. Beaton recounted data elicited from appellee during the course of her seeking treatment so that he could explain the basis on which he formulated his diagnosis and prognosis. When used to show the basis of his expert opinion, a doctor may testify to the history given him by the patient as a non-hearsay use. State v. Griffin, 99 Ariz. 43, 49, 406 P.2d 397 (1965)[1]; Wise v. Monteros, 93 Ariz. 124, 126, 379 P.2d 116 (1963); See also: Reid v. Quebec Paper Sales & Transportation Co., 340 F.2d 34, 38 (2d Cir. 1965); Johnson v. Aetna Life Insurance Co., 221 Cal.App.2d 247, 34 Cal.Rptr. 484, 487 (1963); Smith v. Ernst Hardware Co., 61 Wash.2d 75, 377 P.2d 258, 261 (1963). Where, as here, the appellee's recitals to Dr. Beaton were for the purposes of treatment, the fact

that she had already retained an attorney is not controlling as to the admissibility of the recitals. Plesko v. City of Milwaukee, 19 Wis.2d 210, 120 N.W.2d 130, 134 (1963); Thompson v. Nee, 12 Wis.2d 326, 107 N.W. 2d 150, 152 (1961).

The psychiatrist, even more than any other physician, relies upon statements of the patient in order to formulate his opinion. Modern psychodynamic psychiatry is based upon the premise that the human mind (and body) is indivisible—that human thought, feeling and behavior are not a mosaic of individual faculties. Every tiny bit of information communicated to the psychiatrist becomes an integral part of his comprehension and contributes to the record of his clinical judgment.[2] Conceivably the clinical history may be exaggerated, but this can be brought out with proper cross-examination.

Appellants claim that reversible error was committed in that the lower court permitted Dr. Beaton, over objection, to testify to the contents of reports made by a clinical psychologist, to whom he had referred the appellee in the course of her treatment. When the psychiatrist was asked if the psychological reports tended to confirm his findings, the court sustained the appellants' objections.

Appellee's counsel rephrased the question and asked, "Was there anything which you may have learned from Dr. Tharp which in any way changed your opinion respecting the emotional invalidism of this lady?" An objection to the question was overruled and the witness responded in the negative. Appellee's counsel then asked if it was custom-

1. The Supreme Court of Arizona stated:
   "The jury must be given an opportunity to evaluate the expert's conclusion by his testimony as to what matters he took into consideration to reach it. Therefore the psychiatrist should be allowed to relate what matters he necessarily considered as a 'case history' not as to indicate the ultimate truth thereof, but as one of the bases for reaching his conclusion, according to accepted medical practice." 99 Ariz. at 49, 406 P.2d at 401.

2. The Psychiatrist As An Expert Witness: Some Ruminations and Speculations, Diamond and Louisell, 63 Mich.L.Rev. 1335 (June 1965). The authors point out that it is difficult, but nevertheless essential, that the psychiatrist convincingly communicate to the jury the relevancy of the patient's total life history and suggest "that in all instances the psychiatric expert be allowed to relate to the court exactly how he reached his opinion and what were the sources of his information."

ary and usual to refer a patient to a psychologist to arrive at a complete therapy. The following exchange ensued:

"A. I don't know whether I would say it is customary and usual.[3] Personally when I am taking on any one for therapy I like to have a clinical psychologist's report. I suppose with this same analogy, if a physician were treating a person for anemia, he would like to have a blood count, which is an objective test which aids one, first, in making a diagnosis, and second, in defining objectively those areas which may be (therapeutively) accessible.

"Q. Was your reference to Mrs. Heiderich to Dr. Heiderich reasonable and necessary in this particular case?

"A. To Dr. Tharp?

"Q. Dr. Tharp, yes.

"A. I think it was reasonable and necessary."

■ Appellants' counsel remained silent. We are of the opinion that if the record discloses at any point that Dr. Beaton predicated his opinion upon that of another expert, it must be here. However, failure of appellants' counsel to object to this line of questioning precludes consideration of the propriety of the admission of the testimony.

■ The final assignment of error is directed to the trial court's refusal to instruct on contributory negligence which was alleged in the answer. Counsel indicated that he would submit special instructions thereon but failed to do so and is therefore deemed to have waived request for such instructions. Rule VIII(b) Uniform Rules of Practice, 17 A.R.S.

The judgment is affirmed.

3. It is worthy of note that when the record establishes the practice of psychiatrists to rely upon psychologists' reports in aid of diagnosis, it has been held that the psychiatrist may render his expert opinion despite its being partially based on

KRUCKER, C. J., concurs.

ANTHONY T. DEDDENS, Superior Court Judge (dissenting):

With respect to the misconduct of one of the jurors, I concur that both the trial judge and this court properly ruled in accordance with Arizona law. However, I am unable to agree with my colleagues on the other rulings in this case.

The first issue which I will discuss has to do with the trial judge allowing Dr. Beaton to testify as a medical witness concerning what he described as being "a severe anxiety reaction with hysterical and depressive features" when the mental condition of the plaintiff was not made an issue in the case and was not ever in controversy; and tied in with this subject matter will be a discussion of Rule 35(b) and the failure of plaintiff's counsel to deliver the written report of Dr. Beaton's examination to defendants' counsel.

The second issue is equally serious and deals with the violation of the hearsay rule in allowing Dr. Beaton to testify to a life history given to him by the plaintiff while "ventilating" on the couch in his office. I strongly believe that each of these errors was prejudicial and requires that this case be reversed and remanded for a new trial.

FAILURE OF PLAINTIFF TO MAKE HER MENTAL CONDITION AN ISSUE "IN CONTROVERSY" IN THE CASE, AND FAILURE OF PLAINTIFF TO DELIVER WRITTEN REPORT OF DR. BEATON TO DEFENSE COUNSEL

Plaintiff sued for injuries received by her resulting from the negligence of the defendants in harboring dangerous animals, to wit: two Rhodesian Ridgebacks, on the.

such reports. Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637, 642 (1962); Smith v. United States, 122 U.S. App.D.C. 300, 353 F.2d 838, 842, note 8 (1965).

premises on which the plaintiff worked for defendants, alleging:

"The plaintiff was * * * injured by the defendants' dogs resulting in serious and grievous personal injuries to the plaintiff.

* * * * * *

"[That she suffered] * * * great pain, suffering, annoyance, inconvenience, embarrassment, and will continue to sustain such disabilities for an indeterminate period of time into the future."

Plaintiff also alleged a loss of earnings, past and future. No other allegations in the complaint identified her injuries.

The accident occurred December 1, 1960. Plaintiff's complaint was filed February 15, 1962. On May 31, 1962, plaintiff filed her answers to written interrogatories stating the following matters under oath:

(1) That she was not *at that time* being treated by any doctor as a result of the accident.

(2) That she never had been a patient in a hospital as a result of the accident.

(3) That her injuries were "generally injuries to the left knee and spine."

(4) That the extent of her permanent injuries were "knee and back injuries appear to be permanent."

(5) That the names of all of the physicians who treated her as a result of the injuries involved in the cause of action were:

Hugh Wells, M. D.
North Swan, Tucson, Arizona

H. T. Price, Jr., M. D.
1800 East Speedway, Tucson, Arizona

C. W. Elkins, M. D.
601 North Wilmot, Tucson, Arizona

Charles P. Neumann, M. D.
1540 North Norton, Tucson, Arizona

(6) That she claimed no injuries which were not described in her complaint.

(7) That she did not know of any injuries which were not permanent.

(8) And that she answered an interrogatory demanding the names of all witnesses "who know anything about this case."

Pursuant to Rule 35(a), defendants' counsel obtained a physical examination of plaintiff by one Dr. Eddy and plaintiff made written demand for a copy of the report of that examination and received it as required by Rule 35(b). On June 3, 1962, defendants' counsel made written demand under the rule requesting that plaintiff furnish defendants' counsel:

"* * * with any and all reports of medical examinations previously or hereafter made of Mrs. Heiderich."

Defendants' counsel was furnished by plaintiff's counsel with copies of reports of all of the doctors who had treated Mrs. Heiderich up to that time including two eminent psychiatrists practicing in the Tucson area, namely, Dr. C. W. Elkins and Dr. Charles P. Neumann.

On August 27, 1962, the court ordered a pretrial conference for November 14, 1962. Under date of September 6, 1962, plaintiff's counsel wrote to Dr. Lindsay E. Beaton asking if he would consent to accept Mrs. Heiderich for therapy and to testify as a witness in her case, if it should come to court. Thereafter, Dr. Beaton saw Mrs. Heiderich the first time on September 24, 1962, the second time on October 12, 1962, and for the third and last time on November 2, 1962. Following her second visit, an electroencephalogram was conducted at Tucson Medical Center at his request, which proved to be normal.

Plaintiff's pretrial memorandum was dated November 12, 1962, ten days *after* Dr. Beaton last saw Mrs. Heiderich. Omitting the title of the case, the signature of counsel, and certification of mailing, the pretrial memorandum was set forth in the abstract of record (7 × 9 inch paper, with liberal margins) on two typewritten pages, plus two lines. Its "brief statement of the party's position" required by Rule VI(a) of the Uniform Rules of Practice of the Su-

perior Court consisted of the following enlightening information:

"1. Plaintiff's position is that she was injured as a result of the defendants' negligence in harboring dangerous animals, to wit: Two Rhodesian Ridgeback dogs."

Plaintiff's pretrial memorandum specified "No amendments to the pleading." The pretrial memorandum *did not mention:*

(1) Any claimed damages for a functional overlay or emotional disturbance.

(2) That Dr. Beaton was a treating physician of the plaintiff and had been employed since answers were made to the interrogatories.

(3) That Dr. Beaton would be a witness for plaintiff at the trial.

(4) That plaintiff had acquired any information of a material nature which would render untruthful, unreliable, or inaccurate the answers theretofore made to the interrogatories.

The only reference in the pretrial memorandum to Dr. Beaton were the following words inserted in the middle of a list of fourteen items of special damages:

"Lindsay E. Beaton, M. D.        $75.00"

Under this state of the record, the only issue in controversy in this case at the time of trial was the injury to the left knee and spine of the plaintiff, whether this injury was permanent, and what damages plaintiff should have, assuming that the jury found liability.

At the trial, after the plaintiff and another doctor testified concerning plaintiff's physical injuries arising out of the accident, Dr. Beaton was presented as the last medical witness for plaintiff; whereupon counsel for defendants objected to Dr. Beaton testifying on the following grounds:

(1) That counsel for plaintiff had failed to deliver a copy of the doctor's report to counsel for defendants.

(2) That failure to deliver the medical report of Dr. Beaton and failure to advise defendants that Dr. Beaton was a treating physician and would testify improperly injected the issue of the mental condition of the plaintiff in the case, was a surprise to defendants ("The first we know of it is when we meet him in court," reporter's transcript, page 133) and deprived defendants of their right of discovery with respect to his testimony or their right to pursue further discovery either with regard to the plaintiff or this medical witness on this newly injected issue.

(3) That Dr. Beaton was an expert witness hired specifically to testify at the trial and should not be permitted to detail any hearsay statements made to him by the plaintiff; and,

(4) That the giving of the life history of the plaintiff as presented to Dr. Beaton when she was "ventilating" on the couch in his office was in violation of the rule against hearsay and highly prejudicial to the defendants. This last objection will be discussed more fully in the second part of this opinion.

Following these objections, the jury was excused and court and counsel engaged in a discourse about the objections and the meaning of Rule 35, in which the court concluded that Dr. Beaton's examination was not an examination on the same plane as that of Dr. Eddy's (Dr. Eddy being an orthopedic physician and surgeon) and for that reason there was no duty on plaintiff's counsel to deliver a copy of the report of Dr. Beaton and the trial court mistakenly interpreted the rule (as does the majority of this court) as follows:

" * * * well, I am not sure that I am right but I am going to hold that—hold that under this paragraph when *you had knowledge that there had been an examination which I feel that you derived* at pretrial, which was about twelve days ago, *that you then had the duty of following the last sentence of 35–B.* 'If the party examined refuses to deliver such report to

the Court on motion and notice, the Court on motion and notice may make an order requiring delivery on such terms as are just, and if the physician fails or refuses to make such a report the Court may exclude his testimony if proffered at the trial.' *I am going to read that as being in the conjunctive,* if there has been a refusal after a motion and order then the Court can refuse [the witness], otherwise not." (Emphasis supplied)

Plaintiff contended that because the report of Dr. Eddy indicated that the lady was suffering from a functional overlay some two years after the accident, and because Dr. Beaton's name was mentioned in the pretrial memorandum as making charges for examination, these constituted "red flags" which put counsel for defendants on notice that he should have filed a motion demanding an order for the production of Dr. Beaton's report. The above quoted portion of the transcript shows the trial court "bought" this contention.

What is the meaning of the rule? Rule 35(a) specifies that:

"In an action in which *the mental or physical condition* of a party *is in controversy,* the court * * * may order * * * a physical or mental examination by a physician."

(Emphasis supplied)

And Rule 35(b) provides that if the party examined requests a copy of such medical examination, such a copy shall be delivered to him and that the other party may make a similar request and that such party shall then be entitled

"* * * to receive from the party examined a like report of any examination, previously or thereafter made, *of the same mental or physical condition."*

(Emphasis supplied)

The words "the same mental or physical condition" relate back to the language of 35(a) which refers to "the mental or physical condition of a party" which is "in controversy."

The rule certainly does not make reference to a physical condition which has nothing to do with the case and which is not "in controversy." If the plaintiff had previous difficulty with an ingrown toenail and had similar trouble three months after an accident and had minor surgery or other treatment to the ingrown toenail, that subject matter not · being "in controversy," would place no duty on counsel to present a report of the doctor concerning the ingrown toenail.

It is equally clear that the last paragraph of Rule 35(b) (1) is not to be construed in the conjunctive as the majority of this court also has insisted. The last sentence of the rule reads as follows:

"If the *party* examined refuses to deliver such report the court on motion and notice may make an order requiring delivery on such terms as are just, *and if a physician* fails or refuses to make such a report the court may exclude his testimony if offered at the trial." (Emphasis supplied)

The plain import of this rule is that if a physician fails or refuses to make a report (whether a court order has been made or not), then the court may exclude his testimony if offered at the trial. But before a party entitled to receive a report can make a demand for it, he must be put on notice that another doctor has made an examination of a matter that is "in controversy"; and if it be with regard to new matter not in controversy, then pleadings should be amended to give notice of this new issue. If defense counsel does not know that another doctor has been treating the patient because of a failure to disclose that fact or to amend the pleadings and put that issue "in controversy," how can defense counsel be put on notice to make an application to the court for an order?

At the trial level, counsel for plaintiff took several inconsistent positions. He claimed, among other things, that "the complaint alleges personal injuries and certainly a psychic injury is a personal injury,"

presumably to justify the vagueness of the allegations of his complaint. He claimed there was no showing by defense counsel that Dr. Beaton had actually made a writ-ten report; he claimed that Dr. Eddy's reference in his report to the fact that the lady was suffering from a functional over-lay (more than two years after the accident) was a "red flag," that the fact the pretrial memorandum listed Dr. Beaton's name as making a charge for $75.00 was a "red flag," and that these "red flags" some-how put "in controversy" the mental condi-tion of the plaintiff and thereby notified defense counsel that he should move for an order of the court to obtain the report of Dr. Beaton!

When defense counsel complained to the trial court that he was learning of the existence of Dr. Beaton as a treating phy-sician and a witness in the case for the first time during the trial, plaintiff's coun-sel said:

"I don't know just what the basis of it is that he is objecting to but it strikes me *he is complaining about one side pre-paring the case for trial after the cer-tificate of readiness has been filed*. Well, that rule was never to preclude us from doing whatever is reasonable * * * in support of our claim."

(Emphasis supplied)

Indeed, counsel was industrious in at-tempting to procure additional medical testimony to support his case. In fact, he did not contact Dr. Beaton until *after* the order setting the pretrial conference. Al-though plaintiff's counsel had submitted his client to two well-recognized psychi-atrists in the Tucson area for examination and gave copies of their reports to counsel for defendants, he did not use either of them as witnesses. Then between Septem-ber 24, 1962, and November 2, 1962, *prior* to the pretrial conference, Dr. Beaton ap-pears on the scene, examines and treats the plaintiff on three occasions and con-cludes that all of plaintiff's mental problems were caused by the attack of the dogs

This must be exactly what counsel for plaintiff was looking for when he had Dr. Neumann and Dr. Elkins examine Mrs. Heiderich.

He knew, therefore, prior to the pretrial conference, what Dr. Beaton's testimony would be, knew that he was going to use him as a witness, and these matters were all too good to share with defense counsel, so he ignored the requirements of the dis-covery rule. He obviously preferred to put this information under a bushel basket and spring it as a surprise at the trial. The trial court approved and thereby com-pletely changed the issues of the case in the middle of the trial.

Counsel for plaintiff failed in his duty at the pretrial conference (even though he himself did not personally attend the pre-trial conference) by not defining the real issue of the case then known to him, by not advising the court and counsel what the issues of the case would be or that Dr. Beaton would be a witness as a treating physician, and by not disclosing Dr. Bea-ton's report to counsel.

The duty of counsel to disclose the issues to be raised at trial, during pretrial con-ference, is set forth in 35B C.J.S. Federal Civil Procedure § 908 at 231, in which the test reads as follows:

"Attorneys at a pretrial conference owe a duty to the court and opposing counsel to make a full and fair disclosure of their views as to what the real issues at the trial will be, except only such issues as may involve privilege or impeaching matter."

This is nothing new. The federal courts took a strong stand on this matter as early as 1941 as can be seen from a casual reading of Burton v. Weyerhaeuser Timber Co., 1 F.R.D. 571 (D.C.1941). See also Walker v. West Coast Fast Freight Inc., 233 F.2d 939 (9th Cir. 1956), in an opinion by Chief Judge Denman.

The matter is very distinctly stated by the district court judge in the case of Marble v. Batten & Co., 36 F.R.D. 693 (1964) in

which the court said, at page 694 of the Federal Rules Decisions:

> "The pretrial conference was held sixteen months after suit was filed. By that time the plaintiffs should have known and stated their charges against defendants. The liberalized rules of pleading require the complainant to set forth little more than the general events giving rise to the claimed liability. Thus the pretrial conference serves a purpose more important than the mere efficiency of the judicial process. At the pretrial conference each party should *set forth with clarity its contentions, so as to give notice thereof to the adverse party as to the issues to be tried."* (Emphasis supplied)

Another deplorable phase of this situation is the failure of plaintiff to notify defendants of the radical changes in her sworn answers to interrogatories made necessary by the appearance of Dr. Beaton on the scene.

In Gebhard v. Niedzwiecki, 265 Minn. 471, 122 N.W.2d 110 (1963), interrogatories were filed (and answered) asking for the names of all of the witnesses in the case. During the course of the trial, counsel for plaintiff learned of the names of two witnesses not previously known to them and over the weekend interviewed these witnesses out of state and presented them as witnesses on the following Monday without disclosing to defense counsel the names of the witnesses or the subject matter of their testimony so that they could be interviewed by defense counsel.

The motion to exclude their testimony was granted on the ground that there had been a violation of the spirit of Rule 33 by the attorneys "in failing to transmit the information they had concerning these witnesses to the other party's counsel." At page 113 of the N.W.2d Reporter, the Supreme Court of Minnesota said:

> "The trial court was of the opinion that under Rule 33 *the duty to disclose the names and addresses of witnesses* in answer to interrogatories such as we have *is a continuing one* and *that failure* on

the part of Gebhard's attorneys to disclose to Niedzwiecki's attorneys the names of witnesses discovered after answers to interrogatories had been served *justified suppression of the evidence* that might be elicited from such witnesses.

> *"The main question* for determination here *is whether* under Rule 33 *the obligation to disclose* information discovered after answers to interrogatories are served *is a continuing one* and, if so, what are proper sanctions to be imposed in a case of this kind for failure to comply with that duty.

> \*   \*   \*   \*   \*   \*

> "It should be unnecessary to adopt either of these alternatives. *To require a party to submit successive interrogatories up to the time of trial in order to obtain information discovered after the interrogatories were once answered seems a useless and burdensome procedure.* Similarly, it should be unnecessary to state in the interrogatories that the request is a continuing one. Having in mind the purpose of the rule, we hold that, where the after-acquired information is of a material nature or where it will render the answers originally given untruthful, unreliable, or inaccurate, the obligation to disclose such after-acquired information continues.

> \*   \*   \*   \*   \*   \*

> "Certainly, in a case such as this, *the discovery of witnesses that a party intends to call* comes within the area of information which *must be disclosed.*

> \*   \*   \*   \*   \*   \*

> "The question then arises: What sanctions should be imposed where a party fails to disclose such after-acquired information? Before drastic sanctions are imposed, it should appear that violation of the rule has or will result in prejudice to the party asserting a violation.

> "In this case the evidence was suppressed. In many cases that is the only effective remedy. The object of sanctions should be to prevent the party who fails to comply with the rule *from profit-*

*ing by his own violation.* In cases where there is an honest mistake and the harm can be undone, it may frequently occur that a continuance or some other remedy would be adequate but, where the violation is willful and the party guilty of the violation seeks to take advantage of it at a time when the harm cannot be undone, suppression of the evidence may very well be the proper and only available remedy. We think that is the situation that prevailed here. The undisclosed witnesses were called at the very close of the case. They were discovered several days before they were called. A weekend had intervened. If the names of the witnesses had been disclosed when they were discovered, both parties would have had the same opportunity to interview them." (Emphasis supplied)

The failure to comply with this duty by plaintiff's counsel was even more flagrant in the instant case. He knew of Dr. Beaton's findings and the fact that he would be used as a witness prior to the pretrial conference and at least thirty days prior to the trial itself.

In Taggart v. Vermont Transportation Co., 32 F.R.D. 587, 590 (D.C.1963), the court said:

"But the additional element which is decisive here is the defendants' declaration in their answer to the interrogatories which amounted in effect to a statement that there were no eyewitnesses known to them other than the parties themselves and Clark. To have permitted them to call Reynolds as an eyewitness would be to permit them to reap *an affirmative and surprising advantage at the time of trial,* although it rendered false their answer to the interrogatories. * * * It is one, moreover, *which deals with factual information sworn to by the parties themselves,* and not with briefs or memoranda signed by counsel. *It is, therefore, not unfair to hold them to their oath.*

"In the circumstances presented at the trial the difficult decision had to be made whether to allow the evidence to go in with its accompanying advantage to the defendants of surprising the plaintiff because of their suppression of the existence of the eyewitness, or to require the trial *to proceed as the defendants had channelled it by their answer to the interrogatories and thereby exclude the evidence.* In the one case, violation of the Rules would have brought substantial, unfair advantage to the defendants. In the other case, the jury would have been deprived of some of the evidence then available. The former choice, moreover, would have meant a reinforcement of an attitude of chaotic indifference to the most fundamental requirements of discovery. This is not the first time when the need to maintain an orderly system of procedure has required a court, however regretfully, to impose a sanction which results in the exclusion of some, or even all, of a party's evidence." (Emphasis supplied)

See also Evtush v. Hudson Bus Transp. Co., 7 N.J. 167, 81 A.2d 6 (1951) ; 27 A.L.R. 2d 731, excellent annotation at 737.

The interrogatories demanding to know the nature of plaintiff's injuries, the names of all witnesses who knew anything about the case, and the names of all treating physicians imposed a continuing duty upon counsel for plaintiff to disclose to defendants this material information obtained on the eve of the trial, which made the answers to the interrogatories given by plaintiff untruthful, unreliable, and inaccurate.

The Supreme Court of Arizona recognized this obligation as implied in our rules when it amended Rule VI(a) (5) of the Uniform Rules of Practice of the Superior Court of Arizona, effective March 8, 1965, to provide that every pretrial memorandum shall contain:

"A statement that all answers or supplemental answers to interrogatories under Rule 33 of the Rules of Civil Procedure *reflect facts known to the date of the memorandum.*" (Emphasis supplied)

So far as defendants were concerned, when the trial court overruled objections

to allowing Dr. Beaton to testify, the trial of this case became a "guessing game." See Watts v. Superior Court, 87 Ariz. 1, 5, 347 P.2d 565 (1959).

## WAS THE MENTAL OR EMOTIONAL CONDITION OF THE PLAINTIFF EVER "IN CONTROVERSY" AS AN ISSUE IN THIS CASE?

The answer to the above question and the meaning of Rule 35 in referring to "the mental or physical condition" which "is in controversy" is to be found in federal cases and particularly in a recent opinion of the Supreme Court of the United States.

In Wadlow v. Humberd, 27 F.Supp. 210 (D.C.1939), the district court held that the mental or physical condition of a party must be "immediately and directly in controversy" as a condition to getting an order requiring the mental examination of a party. That was a libel case in which the court refused the defendant's request for a mental examination of the plaintiff.

Mr. Justice Goldberg in the very recent case of Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), gave an excellent interpretation of Rule 35 and the requirement of the rule that a physical or mental examination could not be had unless the subject matter be "in controversy." In *Schlagenhauf,* a party sought to take a neurological and psychiatric examination of a defendant bus driver under Federal Civil Procedure Rule 35 and the trial court ordered the examination. On certiorari to the Supreme Court of the United States, the order was vacated.

In discussing the requirement of Rule 35 that the subject matter of the mental or physical examination must be *directly* in controversy, Mr. Justice Goldberg said, at page 164 of the Lawyers' Edition Reporter [379 U.S. at page 119, 85 S.Ct. at page 243], as follows:

"Of course, there are situations *where the pleadings alone* are sufficient to meet these requirements. A *plaintiff* in a negligence action *who asserts mental or physical injury,* cf. Sibbach v. Wilson & Co.,

supra, 312 U.S. 1, [61 S.Ct. 422, 85 L. Ed. 479] *places that mental or physical injury clearly in controversy* and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury. This is not only true as to a plaintiff, but applies equally to a defendant who asserts his mental or physical condition as a defense to a claim, such as, for example, where insanity is asserted as a defense to a divorce action.

\*   \*   \*   \*   \*   \*

"Here, however, Schlagenhauf did not assert his mental or physical condition either in support of or in defense of a claim. His condition was sought to be placed in issue by other parties. Thus, under the principles discussed above, Rule 35 required that these parties make an affirmative showing that petitioner's mental or physical condition was in controversy and that there was good cause for the examinations requested. This, the record plainly shows, they failed to do." (Emphasis supplied)

The mental and emotional condition of the plaintiff was not made an issue "in controversy" in this case by the broad, general language of the complaint alleging that plaintiff had suffered "personal injuries"; by answering written interrogatories describing her injuries as "generally injuries to the left knee and spine"; by stating that the nature of the permanent injuries she received were "knee and back injuries"; by including the name of Dr. Beaton in a pretrial memorandum showing that a claim would be made for an examination fee; by filing a pretrial memorandum in which it is asserted that the plaintiff's position is "that she was injured as a result of the defendants' negligence in harboring dangerous animals, to wit: two Rhodesian Ridgeback dogs"; or by refusing to disclose that Dr. Beaton would be a witness and by failing to deliver the report of his examination and findings.

Under all the circumstances of this case, it was a manifest abuse of discretion to per-

mit Dr. Beaton to testify over defendants' objection, for which a new trial should be granted.

## VIOLATION OF THE HEARSAY RULE IN THE TESTIMONY OF DR. BEATON

Over the twofold objection of defendants (1) that the testimony of Dr. Beaton as to the life history of plaintiff was hearsay and (2) that Dr. Beaton was an expert medical witness and not a treating physician and could not therefore relate history or base his opinion thereon, Dr. Beaton was permitted to relate a history given him by the plaintiff, a 58 year old woman. This history began with her early childhood and concluded with her first visit to his office, some two years after the injuries which resulted in this law suit. It is a tragic, sympathetic story story calculated to induce a jury to give a widow of her age far more than they ever would have awarded her based upon a cold and dispassionate consideration of the relatively minor injuries which she sustained in this accident. The jury returned a verdict for the full amount plaintiff asked for, to wit: $25,000.00. A verdict for $2,500.00 would have been very high considering the minor injuries which she received from the dogs.

The hearsay story which Dr. Beaton was permitted to relate to the jury was the story which the plaintiff related to him while she was "ventilating" on the couch in his office (the term Dr. Beaton used referring to the "jargon of the profession"). It may be summarized as follows:

Plaintiff was born in Germany and had a very close attachment to her father, but had difficulties with him. She succeeded in marrying considerably above her station in life, which meant a great deal in Germany in those days. She had the misfortune of giving birth to an epileptic son, who was subsequently killed by the Nazis in their effort to improve the human race through their euthanasia program. Shortly after that her husband was killed by the Nazis when he was arrested, along with some 5,000 other persons, who were suspected of participating in the plot to kill Hitler. After the war, she was fortunate enough to immigrate to the United States, received employment with the defendants, was happy with her job, was a hard-working person, and made application for citizenship.

Her first doctor put a cast on her leg for a period of twelve days after the accident and while the cast was being removed the saw slightly cut her leg and drew some blood; about this time she discovered that she was not covered by workmen's compensation and became very fearful that she would not be allowed to become a citizen of the United States if she had unpaid debts, such as doctor bills, etc., (although at the time of the trial she testified that she was a citizen), and all of these factors together caused her to become completely "decompensated" in the words of the doctor and "off the track" and he was trying to "put her back on the rail."

Counsel for plaintiff endeavored to get this story into the record through the plaintiff's testimony, but the trial court persistently sustained objections thereto, although plaintiff did manage to add that she had a daughter who was poisoned. However, the trial court permitted all of this testimony to be given by the psychiatrist on the theory that he was a treating physician and that the doctor should be permitted to explain his opinion of his patient to the jury.

In addition, Dr. Beaton testified that plaintiff was a complete neurotic and wholly unfit for work when she came to him; she was not psychotic, but she was neurotically ill; that the time she first came to see him, she had a number of complaints of pain, numbness, a feeling that her hip was out of joint and that it was sticking out farther than it ever did, but that "none of these things are borne out upon a physical examination."

It is true that if Dr. Beaton were a medical expert witness hired on the eve of trial for the sole purpose of testifying, he could not relate hearsay history over objections. Gilbert v. Quinet, 91 Ariz. 29, 32, 369 P.2d

267, 269 (1962). Dr. Beaton contended that he accepted employment to treat the plaintiff; on the basis of three visits to the doctor prior to trial, the trial judge ruled that he was a treating physician. I think this was within the discretion of the trial judge.

However, not even a treating physician is entitled to give a lifetime hearsay history of the patient. In Wise v. Monteros, 93 Ariz. 124, 125, 379 P.2d 116 (1963), the Supreme Court of Arizona recognized the right of a treating physician to recount hearsay history furnished by the patient which consisted of the plaintiff's explanation of *how the injury occurred and the conditions or symptoms from which he was then suffering.* The opinion states:

> "At the trial, a doctor to whom plaintiff had gone six or seven weeks after the incident *testified to plaintiff's statements as to the manner in which the injuries occurred.* This testimony was objected to by defendant." (Emphasis supplied)

The doctor's testimony in this regard is quoted at length in the opinion (pages 125–126, 379 P.2d 116) and it consisted of nothing more than a statement that the man had been assaulted and a recitation of the symptoms from which he was then suffering.

At page 126 of the Arizona Reports, at pages 117–118 of 379 P.2d, our Supreme Court said:

> "Defendant claims that the testimony of the doctor as to statements made by the plaintiff are hearsay. There is no doubt that testimony by the doctor to statements made by plaintiff as to how the injuries were received are hearsay and are *not* admissible to prove the truth of the statements. But here the statements were recounted by the doctor so that he could explain the basis on which he had an opinion of the condition and prognosis of the plaintiff. When used for such a purpose, a doctor may testify to the history given him by an injured plaintiff as a non-hearsay use."

This proposition of law finds support elsewhere in eminent authority. 20 Am.

Jur. Evidence § 866 at 728, 729. Indeed, many of the authorities allow the hearsay statements *only* "if such statements describe his bodily condition at the time of the examination or his present sufferings or symptoms." 20 Am.Jur. Evidence § 866 at 730.

But my colleagues persist that Dr. Beaton is a psychiatrist and since he must know the life history of the patient in order to treat her, he should be able to tell all of this background history for the purpose of explaining to the jury his diagnosis and his opinion of her psychiatric condition. They cite authorities which do not support them.

The first case they cite is Reid v. Quebec Paper Sales & Transportation Co., 340 F.2d 34, 38 (2d Cir.1965), in which an *examining* doctor (not a treating physician) was allowed to relate "Reid's complaint of past headaches." This was offered to show the basis of the doctor's diagnosis, not to establish the fact that Reid did have headaches. The court said that it was not error "[e]specially since the judge was [a] trier of fact, we can presume that this testimony was confined to this non-hearsay purpose."

Since this case allowed the hearsay testimony of an examining, not a treating physician, it was contrary to the ruling of the Supreme Court of Arizona in Wise v. Monteros and Gilbert v. Quinet, supra, and is not worthy of credence.

They cite Johnson v. Aetna Life Insurance Co., 221 Cal.App.2d 247, 34 Cal.Rptr. 484, 487 (1963), in which the court refused to receive certain statements in hospital records to the effect "that the insured slipped and fell and afterwards experienced discoloration of his foot." The appellate court said:

> "The statements * * * were irrelevant to the issue at hand; *would not have been admissible if offered as a part of the testimony of the attending physician* (citations omitted); were not made admissible merely by their inclusion of the hospital records (citations omitted); and properly were excluded." (Emphasis supplied)

A casual reading of the two Wisconsin cases also discloses that they fail to support my colleagues. The first is Thompson v. Nee, 12 Wis.2d 326, 107 N.W.2d 150, 152 (1961) in which objection was made to the doctor testifying that when Mrs. Thompson came to him several months after the accident *"she complained to him* of pain in the back, head and neck."

This is exactly the same type of testimony which was allowed by the trial court and approved by the Supreme Court of Arizona in Wise v. Monteros, supra. The real meaning of the *Thompson* case is found in the following quotation from the Supreme Court of Wisconsin at page 152:

> "On the record before us, Dr. Suckle's testimony including his patient's recital to him *of her subjective symptoms,* was admissible in evidence. The recital was given and heard for the sole purpose of treatment." (Emphasis supplied)

The second Wisconsin case, Plesko v. City of Milwaukee, 19 Wis.2d 210, 120 N.W.2d 130, 134 (1963), also was one in which the doctor was employed for treatment long before trial and was permitted to relate the subjective symptoms given by his patient when originally employed; he was also permitted to testify to subjective symptoms related by the plaintiff to him on the day before trial. These later statements were held to be error because they were too close to the trial, but held not to be reversible error because counsel failed to renew his objections properly after verdict.

The doctor in *Plesko* was permitted to testify that "she complained of pain when walking and during weather changes, discoloration and tenderness" in her leg. With respect to such statements, the Supreme Court of Wisconsin said at page 134 of the N.W.2d Reporter:

> " * * * we hold that the trial court's rulings, which permitted Dr. Montgomery to testify concerning *the subjective symptoms* related by plaintiff, *were proper* because of plaintiff's testimony that she consulted Dr. Montgomery for treatment.

> * * * * * *

> "Dr. Montgomery's testimony concerning plaintiff's report of subjective symptoms on the day before trial was inadmissible because of the report's proximity to trial." (Emphasis supplied)

*Thompson, Plesko,* and *Reid,* supra, confirm this dissenting opinion and the Supreme Court of Arizona in Wise v. Monteros, supra. Smith v. Ernst Hardware Co., 61 Wash.2d 75, 377 P.2d 258 (1962), also fails to support my colleagues. Here, too, the treating physician was allowed to testify to symptoms related to him by the patient, but the court rejected the doctor's contention that her sinus condition was the result of an accident when it followed catching cold in the hospital while she was there for treatment six months after the accident. The Supreme Court of Washington said at page 261 of the Pacific Reporter:

> *"Causal relationship* cannot be established by the doctor's hearsay testimony.

> * * * * * *

> " * * * we hold that Dr. Maas' testimony was admissible for the limited purpose of establishing the basis upon which the doctor premised his opinion. The doctor's hearsay evidence had no probative value to establish the fact of the cold, upon which he predicated his conclusion relative to the causal relationship between the accident and the sinus condition. *Since the causal relationship between the accident and the sinus condition was not otherwise established,* the trial court properly granted a new trial * * *."

(Emphasis supplied)

This entire matter is very thoroughly discussed in an excellent annotation in 51 A.L.R.2d 1051, 1065, in which the position of this dissenting opinion is ably supported.

Next my colleagues cite the criminal case of People v. Modesto, 59 Cal.2d 722, 31 Cal.Rptr. 225, 231, 382 P.2d 33 (1963) in which the defendant was convicted on two

counts of first degree murder and a psychiatrist, employed by the defendant for the purpose of testifying as an expert at the trial, was repeatedly allowed to express her opinion that the defendant did not have the intent to take life when he entered the home; that he did not enter with the intent to strike either of the girls; and that he did not enter with the intent to sexually molest either of the girls; however, the court refused to allow the psychiatrist to use a tape recording of the defendant's statements made to her which was offered to show the defendant's state of mind.

The Supreme Court of California reversed. This is not unusual. Our courts have long recognized that in criminal cases the entire life history of the defendant can be placed in evidence because any facet or phase of his past life may have some bearing on the issue of his sanity. We recognized this rule in Arizona in Burgunder v. State, 55 Ariz. 411, 103 P.2d 256 (1940). In *Burgunder,* a murder case, defendant complained that the court had admitted evidence showing that he committed other crimes than the one charged. At page 426 of the Arizona Reporter, at page 263 of 103 P.2d, our Supreme Court said:

"* * * That rule is completely disregarded, however, when the defense is insanity. Under such a defense defendant is permitted to give to the jury his personal history and in doing so he is not restricted to any particular acts or conduct. If he open that field of inquiry for the purpose of showing he was insane when he committed the act, the state may also explore the same field and present to the jury any pertinent discovery not disclosed by the defendant. The rule is stated by Wigmore on Evidence, 3d Ed., Vol. 1, Section 228, as follows:

'The first and fundamental rule, then, will be that *any and all conduct of the person is admissible in evidence.* There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light one way or the other upon the issue. "Upon this I believe that no difference of opinion will be found to exist," said Mr. Justice Patteson, in a celebrated case, "as to the principle on which such evidence is admissible: Every act of the party's life is relevant to the issue." There can be no escape from this consequence. There is no distinction in kind (whatever there may be in degree) between one or another piece of conduct as evidence to be considered; *some* inference is always possible.' " (Emphasis supplied)

In the more recent case of State v. Griffin, 99 Ariz. 43, 406 P.2d 397 (1965) we see the other side of the coin, in which the trial court unduly restricted the testimony of past history which the defendant sought to relate, and restricted the psychiatrist from relating the matters on which he based his conclusion, including a life history from the defendant. In *Griffin,* supra, our Supreme Court reversed the trial court for not allowing the defendant to testify as to his personal history during the nine years of his marriage and for not allowing a psychiatrist to testify with regard to the facts and circumstances in the defendant's background and the defendant's mental defects or abnormalities upon which the psychiatrist based his ultimate opinion on the issue of insanity.

After quoting from Wigmore above, supra, taken from Burgunder v. State, supra, our Supreme Court said in 99 Ariz. 43 at 48, 406 P.2d 397 at 400:

"As we said in State v. Crose, 88 Ariz. 389, 357 P.2d 136 (1960) where the defendant raises the issue of his sanity, *the legal question* which the jury must determine *is the defendant's responsibility for his conduct at the time the crime was committed. To resolve this vital issue of criminal responsibility it is necessary that the jury have the en-*

*tire picture of the defendant.* Insanity resulting in criminal acts is not a sudden growth even if the prohibited conduct seems to be of a sudden explosive nature.

\*   \*   \*   \*   \*   \*

"In the same vein to allow a psychiatrist as an expert witness to answer without any explanation the question of whether the accused knew the difference between right and wrong at the time he committed the act would impart a meaningless conclusion to the jury. The jury must be given an opportunity to evaluate the expert's conclusion by his testimony as to what matters he took into consideration to reach it. Therefore the psychiatrist should be allowed to relate what matters he necessarily considered as a 'case history' not as to indicate the ultimate truth thereof, but as one of the bases for reaching his conclusion, according to accepted medical practice. The court should therefore exercise care in the manner in which such testimony is elicited, so that the jury may understand that the case history does not constitute factual evidence, unless corroborated by other competent evidence." (Emphasis supplied)

The question of criminal responsibility is completely different from the question of whether a psychiatrist, who is treating a patient, should be permitted in a civil suit to relate a hearsay life history of his patient. In a criminal case it has always been the rule that the psychiatrist could base his opinion upon the past history of the defendant and could relate that history to support it. Indeed, it is now established to be the law in Arizona that even non-expert witnesses may express their opinion of the sanity or insanity of an accused whose mental condition is in issue, provided that the non-expert witness relates facts, circumstances, acts, conversations, and conduct of the accused upon which he bases his opinion. State v. Griffin, supra.

My colleagues make reference to the article "The Psychiatrist As An Expert Witness: Some Ruminations and Speculations," Diamond & Louisell, 63 Michigan Law Review 1335 (June 1965). This is an excellent article which deals entirely with the psychiatrist as an *expert witness* testifying in a criminal case reference to the insanity of the defendant and therefore has no bearing upon the case before this court.

Accordingly, the rule of law applicable in criminal cases wherein the psychiatrist appears as an expert witness testifying to the state of the defendant's mind at the time of commission of the offense or to his sanity or insanity is of no assistance to us in this inquiry.

There is still other persuasive authority upon this subject, although I recognize that it is not presently the law of Arizona, and I refer to the Uniform Rules of Evidence which have been adopted by the American Law Institute in May 1964, were approved by the National Conference of Commissions on Uniform State Laws and by the American Bar Association in the year 1963. One of the objections sometimes voiced against the Uniform Rules of Evidence is that many of the rules of evidence therein set forth present too liberal a rule.

Rule 63, subsection 12, deals with hearsay evidence and its particular application to the facts of this case. It reads as follows (leaving out the portions not pertinent to this case):

> "Rule 63. Hearsay Evidence Excluded—Exceptions
>
> "Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except:
>
> \*   \*   \*   \*   \*   \*
>
> "12. Statements of Physical or Mental Condition of Declarant.
>
> > Unless the judge finds that it was made in bad faith, a statement of the declarant's
> >
> > (a) *then existing state of mind* \* \* \* including statements of \* \* \* mental feeling, pain,

and bodily health, *but not including memory or belief* to prove the fact remembered * * * when such a mental or physical condition is in issue * * *, or (b) previous symptoms, pain or physical sensation, *made to a physician consulted for treatment,* and relevant to an issue of declarant's bodily condition; * * *"

(Emphasis supplied)

Although I think the only portion of the above quotation applying to the facts of this case is subsection (b), it is plain that either subsection (a) or (b) precludes the giving of a life history of a patient, related through a medical witness who learned of the matters while the patient was ventilating on the couch.

The comment of the American Law Institute following the language of subsection (12) of Rule 63, reference being to clause (b) thereof, calls attention to the fact that to the extent that subsection (b) admits evidence of declarations of past pain by a declarant when made to a physician under the circumstances therein stated, the rule is a departure from the common law rule in a good many states, but cites Wigmore as authority that this extension should be made. The reference to Wigmore is Volume VI, 3d Edition, § 1722(c).

My colleagues say, referring to the story obtained from the patient on the couch, that "conceivably the clinical history may be exaggerated, but this can be brought out with proper cross-examination." We could quote at length from Douglass v. State, 44 Ariz. 84, 33 P.2d 985 (1934) in an opinion by the eminent jurist Alfred C. Lockwood, who quotes for one full page (page 93 of Arizona Reporter, 33 P.2d 985) from Dean Wigmore disclosing the absolute impossibility of cross-examining hearsay testimony.

The quotation is interesting reading. We understood that the real vice of hearsay was that the "declarant" could not be cross-examined through the hearsay witness.

Let us suppose that defense counsel in the instant case had sought to cross-examine Dr. Beaton about the statements made to him by Mrs. Heiderich while she was "ventilating" on the couch in his office, particularly with regard to things that happened when she was a child in Germany. What would have been the doctor's answer? "That was what my patient told me while she was ventilating on the couch." And so, each succeeding question would have gone back to the couch—back to the couch—back to the couch—back to the couch!

Indeed, when the trial court in this case allowed Dr. Beaton to tell the story which the plaintiff related to him while she was "ventilating" on the couch, the psychiatrist's couch was on the witness stand in the superior court of Pima County. The matters which plaintiff's counsel sought to bring out through the plaintiff herself and which the trial court properly refused when she was on the stand were now brought out while the couch was on the witness stand.

The writer of this dissenting opinion can only hope that the Supreme Court of Arizona will reverse the trial court and thereby preclude the couch from taking the witness stand in a civil action as was done in this case.

For the foregoing reasons, I believe that this case should be reversed and a new trial ordered.

NOTE: Judge JOHN F. MOLLOY having requested that he be relieved from consideration of this matter, Judge ANTHONY T. DEDDENS was called to sit in his stead and participate in the determination of this decision.